# HARMELIN *v.* MICHIGAN

No. 89–7272.   Argued November 5, 1990—Decided June 27, 1991

958

*Carla J. Johnson,* by appointment of the Court, 497 U. S. 1022, argued the cause and filed a brief for petitioner.

*Richard Thompson* argued the cause for respondent. With him on the brief was *Michael J. Modelski.*\*

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Steven R. Shapiro;* and for Criminal Defense Attorneys of Michigan et al. by *Neil H. Fink, Elizabeth L. Jacobs,* and *William Swor.*

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Starr, Acting Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *James A. Feldman;* for the State of

JUSTICE SCALIA announced the judgment of the Court and delivered the opinion of the Court with respect to Part IV, and an opinion with respect to Parts I, II, and III, in which THE CHIEF JUSTICE joins.

Petitioner was convicted of possessing 672 grams of cocaine and sentenced to a mandatory term of life in prison without possibility of parole.[1]   The Michigan Court of Appeals initially reversed his conviction because evidence supporting it had been obtained in violation of the Michigan Constitution. 176 Mich. App. 524, 440 N. W. 2d 75 (1989).   On petition for rehearing, the Court of Appeals vacated its prior decision and affirmed petitioner's sentence, rejecting his argument that the sentence was "cruel and unusual" within the meaning of the Eighth Amendment.   *Id.*, at 535, 440 N. W. 2d, at 80.   The Michigan Supreme Court denied leave to appeal, 434 Mich. 863 (1990), and we granted certiorari.   495 U. S. 956 (1990).

Petitioner claims that his sentence is unconstitutionally "cruel and unusual" for two reasons: first, because it is "significantly disproportionate" to the crime he committed; second, because the sentencing judge was statutorily required to

---

Arizona by *Robert K. Corbin,* Attorney General, *Jessica Gifford Funk-houser,* and *Vicki Gotkin Adler,* Assistant Attorney General; for the State of Michigan by *Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *K. Davison Hunter* and *Thomas C. Nelson,* Assistant Attorneys General; for the National District Attorneys Association by *Richard P. Ieyoub, Jack E. Yelverton,* and *James P. Manak;* for the Prosecuting Attorneys Association of Michigan by *Robert Weiss, John D. O'Hair,* and *Timothy A. Baughman;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Paul D. Kamenar.*

[1] Michigan Comp. Laws Ann. § 333.7403(2)(a)(i) (West Supp. 1990–1991) provides a mandatory sentence of life in prison for possession of 650 grams or more of "any mixture containing [a schedule 2] controlled substance"; § 333.7214(a)(iv) defines cocaine as a schedule 2 controlled substance.   Section 791.234(4) provides eligibility for parole after 10 years in prison, except for those convicted of either first-degree murder or "a major controlled substance offense"; § 791.233b[1](b) defines "major controlled substance offense" as, *inter alia,* a violation of § 333.7403.

impose it, without taking into account the particularized circumstances of the crime and of the criminal.

I

A

The Eighth Amendment, which applies against the States by virtue of the Fourteenth Amendment, see *Robinson* v. *California*, 370 U. S. 660 (1962), provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." In *Rummel* v. *Estelle*, 445 U. S. 263 (1980), we held that it did not constitute "cruel and unusual punishment" to impose a life sentence, under a recidivist statute, upon a defendant who had been convicted, successively, of fraudulent use of a credit card to obtain $80 worth of goods or services, passing a forged check in the amount of $28.36, and obtaining $120.75 by false pretenses. We said that "one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative." *Id.*, at 274. We specifically rejected the proposition asserted by the dissent, *id.*, at 295 (opinion of Powell, J.), that unconstitutional disproportionality could be established by weighing three factors: (1) gravity of the offense compared to severity of the penalty, (2) penalties imposed within the same jurisdiction for similar crimes, and (3) penalties imposed in other jurisdictions for the same offense. *Id.*, at 281–282, and n. 27. A footnote in the opinion, however, said: "This is not to say that a proportionality principle would not come into play in the extreme example mentioned by the dissent, . . . if a legislature made overtime parking a felony punishable by life imprisonment." *Id.*, at 274, n. 11.

Two years later, in *Hutto* v. *Davis*, 454 U. S. 370 (1982), we similarly rejected an Eighth Amendment challenge to a

prison term of 40 years and fine of $20,000 for possession and distribution of approximately nine ounces of marijuana. We thought that result so clear in light of *Rummel* that our *per curiam* opinion said the Fourth Circuit, in sustaining the constitutional challenge, "could be viewed as having ignored, consciously or unconsciously, the hierarchy of the federal court system," which could not be tolerated "unless we wish anarchy to prevail," 454 U. S., at 374–375. And we again explicitly rejected application of the three factors discussed in the *Rummel* dissent.[2] See 454 U. S., at 373–374, and n. 2. However, whereas in *Rummel* we had said that successful proportionality challenges outside the context of capital punishment "have been exceedingly rare," 445 U. S., at 272 (discussing as the solitary example *Weems* v. *United States*, 217 U. S. 349 (1910), which we explained as involving punishment of a "unique nature," 445 U. S., at 274), in *Davis* we misdescribed *Rummel* as having said that "'successful challenges . . .' *should be* 'exceedingly rare,'" 454 U. S., at 374 (emphasis added), and at that point inserted a reference to, and description of, the *Rummel* "overtime parking" footnote, 454 U. S., at 374, n. 3. The content of that footnote was imperceptibly (but, in the event, ominously) expanded: *Rummel's* "not [saying] that a proportionality principle would not come into play" in the fanciful parking example, 445 U. S., at 274, n. 11, became "not[ing] . . . that there could be situations in which the proportionality principle *would* come into play, *such as*" the fanciful parking example, *Davis, supra,* at 374, n. 3 (emphasis added). This combination of expanded text plus expanded footnote permitted the inference that gross disproportionality was an example of the "exceedingly rare" situations in which Eighth Amendment challenges "should be" successful. Indeed, one might say

---

[2] Specifically, we rejected, in some detail, the four-factor test promulgated by the Fourth Circuit in *Hart* v. *Coiner*, 483 F. 2d 136 (1973). This test included the three factors relied upon by the *Rummel* dissent. See *Hart, supra,* at 140–143.

that it positively invited that inference, were that not incompatible with the sharp *per curiam* reversal of the Fourth Circuit's finding that 40 years for possession and distribution of nine ounces of marijuana was grossly disproportionate and therefore unconstitutional.

A year and a half after *Davis* we uttered what has been our last word on this subject to date. *Solem* v. *Helm*, 463 U. S. 277 (1983), set aside under the Eighth Amendment, because it was disproportionate, a sentence of life imprisonment without possibility of parole, imposed under a South Dakota recidivist statute for successive offenses that included three convictions of third-degree burglary, one of obtaining money by false pretenses, one of grand larceny, one of third-offense driving while intoxicated, and one of writing a "no account" check with intent to defraud. In the *Solem* account, *Weems* no longer involved punishment of a "unique nature," *Rummel, supra,* at 274, but was the "leading case," *Solem,* 463 U. S., at 287, exemplifying the "general principle of proportionality," *id.,* at 288, which was "deeply rooted and frequently repeated in common-law jurisprudence," *id.,* at 284, had been embodied in the English Bill of Rights "in language that was later adopted in the Eighth Amendment," *id.,* at 285, and had been "recognized explicitly in this Court for almost a century," *id.,* at 286. The most recent of those "recognitions" were the "overtime parking" footnotes in *Rummel* and *Davis,* 463 U. S., at 288. As for the statement in *Rummel* that "one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies . . . the length of the sentence actually imposed is purely a matter of legislative prerogative," *Rummel, supra,* at 274: according to *Solem,* the really important words in that passage were " '*one could argue,*' " 463 U. S., at 288, n. 14 (emphasis added in *Solem*). "The Court [in *Rummel*] . . . merely recognized that the argument was possible. To the extent that the State . . . makes this argument here, we find it meritless." *Id.,* at 289,

n. 14. (Of course *Rummel* had not said merely "one could argue," but "one could argue *without fear of contradiction by any decision of this Court.*" (Emphasis added.)) Having decreed that a general principle of disproportionality exists, the Court used as the criterion for its application the three-factor test that had been explicitly rejected in both *Rummel* and *Davis.* 463 U. S., at 291–292. Those cases, the Court said, merely "indicated [that] no one factor will be dispositive in a given case," *id.*, at 291, n. 17—though *Davis* had expressly, approvingly, and quite correctly described *Rummel* as having "disapproved *each of* [the] objective factors," 454 U. S., at 373 (emphasis added). See *Rummel*, 445 U. S., at 281–282, and n. 27.

It should be apparent from the above discussion that our 5-to-4 decision eight years ago in *Solem* was scarcely the expression of clear and well accepted constitutional law. We have long recognized, of course, that the doctrine of *stare decisis* is less rigid in its application to constitutional precedents, see *Payne* v. *Tennessee, ante,* at 828; *Smith* v. *Allwright,* 321 U. S. 649, 665, and n. 10 (1944); *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600, 627–628 (1974) (Powell, J., concurring); *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 406–408 (1932) (Brandeis, J., dissenting), and we think that to be especially true of a constitutional precedent that is both recent and in apparent tension with other decisions. Accordingly, we have addressed anew, and in greater detail, the question whether the Eighth Amendment contains a proportionality guarantee—with particular attention to the background of the Eighth Amendment (which *Solem* discussed in only two pages, see 463 U. S., at 284–286) and to the understanding of the Eighth Amendment before the end of the 19th century (which *Solem* discussed not at all). We conclude from this examination that *Solem* was simply wrong; the Eighth Amendment contains no proportionality guarantee.

## B

*Solem* based its conclusion principally upon the proposition that a right to be free from disproportionate punishments was embodied within the "cruell and unusuall Punishments" provision of the English Declaration of Rights of 1689, and was incorporated, with that language, in the Eighth Amendment. There is no doubt that the Declaration of Rights is the antecedent of our constitutional text. (This document was promulgated in February 1689 and was enacted into law as the Bill of Rights, 1 Wm. & Mary, Sess. 2, ch. 2, in December 1689. See Sources of Our Liberties 222–223 (R. Perry & J. Cooper eds. 1959); L. Schwoerer, Declaration of Rights, 1689, pp. 279, 295–298 (1981).) In 1791, five State Constitutions prohibited "cruel or unusual punishments," see Del. Declaration of Rights, § 16 (1776); Md. Declaration of Rights, § XXII (1776); Mass. Declaration of Rights, Art. XXVI (1780); N. C. Declaration of Rights, § X (1776); N. H. Bill of Rights, Art. XXXIII (1784), and two prohibited "cruel" punishments, Pa. Const., Art. IX, § 13 (1790); S. C. Const., Art. IX, § 4 (1790). The new Federal Bill of Rights, however, tracked Virginia's prohibition of "cruel *and* unusual punishments," see Va. Declaration of Rights, § 9 (1776), which most closely followed the English provision. In fact, the entire text of the Eighth Amendment is taken almost verbatim from the English Declaration of Rights, which provided "[t]hat excessive Baile ought not to be required nor excessive Fines imposed nor cruell and unusuall Punishments inflicted."

Perhaps the Americans of 1791 understood the Declaration's language precisely as the Englishmen of 1689 did — though as we shall discuss later, that seems unlikely. Or perhaps the colonists meant to incorporate the content of that antecedent by reference, *whatever* the content might have been. *Solem* suggested something like this, arguing that since Americans claimed "all the rights of English subjects," "their use of the language of the English Bill of Rights is con-

vincing proof that they intended to provide at least the same protection," 463 U. S., at 286. Thus, not only is the original meaning of the 1689 Declaration of Rights relevant, but also the circumstances of its enactment, insofar as they display the particular "rights of English subjects" it was designed to vindicate.

As *Solem* observed, 463 U. S., at 284–285, the principle of proportionality was familiar to English law at the time the Declaration of Rights was drafted. The Magna Carta provided that "[a] free man shall not be fined for a small offence, except in proportion to the measure of the offense; and for a great offence he shall be fined in proportion to the magnitude of the offence, saving his freehold . . . ." Art. 20 (translated in Sources of Our Liberties, *supra*, at 15). When imprisonment supplemented fines as a method of punishment, courts apparently applied the proportionality principle while sentencing. *Hodges* v. *Humkin*, 2 Bulst. 139, 140, 80 Eng. Rep. 1015, 1016 (K. B. 1615) (Croke, J.) ("[I]mprisonment ought always to be according to the quality of the offence"). Despite this familiarity, the drafters of the Declaration of Rights did not explicitly prohibit "disproportionate" or "excessive" punishments. Instead, they prohibited punishments that were "cruell and unusuall." The *Solem* Court simply assumed, with no analysis, that the one included the other. 463 U. S., at 285. As a textual matter, of course, it does not: a disproportionate punishment can perhaps always be considered "cruel," but it will not always be (as the text also requires) "unusual." The error of *Solem*'s assumption is confirmed by the historical context and contemporaneous understanding of the English guarantee.

Most historians agree that the "cruell and unusuall Punishments" provision of the English Declaration of Rights was prompted by the abuses attributed to the infamous Lord Chief Justice Jeffreys of the King's Bench during the Stuart reign of James II. See, *e. g.*, Schwoerer, *supra*, at 93; 4 W. Blackstone, Commentaries *372. They do not agree, how-

ever, on which abuses. See *Ingraham* v. *Wright*, 430 U. S. 651, 664–665 (1977); *Furman* v. *Georgia*, 408 U. S. 238, 317–319 (1972) (MARSHALL, J., concurring). Jeffreys is best known for presiding over the "Bloody Assizes" following the Duke of Monmouth's abortive rebellion in 1685; a special commission led by Jeffreys tried, convicted, and executed hundreds of suspected insurgents. Some have attributed the Declaration of Rights provision to popular outrage against those proceedings. *E. g.*, Sources of Our Liberties, *supra*, at 236, n. 103; Note, What Is Cruel and Unusual Punishment, 24 Harv. L. Rev. 54, 55, n. 2 (1910); see also 3 J. Story, Commentaries on the Constitution of the United States § 1896 (1833).[3]

But the vicious punishments for treason decreed in the Bloody Assizes (drawing and quartering, burning of women felons, beheading, disembowling, etc.) were common in that period—indeed, they were specifically authorized by law and remained so for many years afterwards. See Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839, 855–856 (1969); 4 Blackstone, *supra*, at *369–*370. Thus, recently historians have argued, and the best historical evidence suggests, that it was not Jeffreys' management of the Bloody Assizes that led to the Declaration of Rights provision, but rather the arbitrary sentencing power he had exercised in administering justice from the King's Bench, particularly when punishing a notorious perjurer. See Granucci, *supra*, at 855–860; Schwoerer, *supra*, at 92–93. Accord, 1 J. Stephen, A History of the Criminal Law of England 490 (1883); 1 J. Chitty, Criminal Law 712 (5th Am. ed. 1847) (hereinafter Chitty). Jeffreys was widely accused of "inventing" special penalties for the King's enemies, penalties that were not authorized by common-law precedent or statute. Letter to a Gentleman at Brussels,

---

[3] *Solem* v. *Helm*, 463 U. S. 277 (1983), apparently adopted this interpretation, quoting, as it did, from one of these sources. See *id.*, at 285 (quoting Sources of Our Liberties 236 (R. Perry & J. Cooper eds. 1959)).

giving an account of the people's revolt (Windsor, Dec. 2, 1688), cited in L. Schwoerer, The Declaration of Rights, 1689, p. 93, n. 207 (1981).

The preamble to the Declaration of Rights, a sort of indictment of James II that calls to mind the preface to our own Declaration of Independence, specifically referred to illegal sentences and King's Bench proceedings.

> "Whereas the late King James the Second, by the Assistance of diverse evill Councellors Judges and Ministers imployed by him did endeavour to subvert and extirpate the Protestant Religion, and the Lawes and Liberties of this Kingdome.

> .       .       .       .       .

> "By Prosecutions in the Court of Kings Bench for Matters and Causes cognizable onely in Parlyament and by diverse other Arbitrary and Illegall Courses.

> .       .       .       .       .

> "[E]xcessive Baile hath beene required of Persons committed in Criminall Cases to elude the Benefit of the Lawes made for the Liberty of the Subjects.
> "And excessive Fines have been imposed.
> "And illegall and cruell Punishments inflicted.

> .       .       .       .       .

> "All which are utterly and directly contrary to the knowne Lawes and Statutes and Freedome of this Realme." 1 Wm. & Mary, Sess. 2, ch. 2 (1689).

The only recorded contemporaneous interpretation of the "cruell and unusuall Punishments" clause confirms the focus upon Jeffreys' King's Bench activities, and upon the illegality, rather than the disproportionality, of his sentences. In 1685 Titus Oates, a Protestant cleric whose false accusations had caused the execution of 15 prominent Catholics for allegedly organizing a "Popish Plot" to overthrow King Charles II in 1679, was tried and convicted before the King's Bench for perjury. Oates' crime, "bearing false witness against another, with an express premeditated design to take away his

life, so as the innocent person be condemned and executed," had, at one time, been treated as a species of murder, and punished with death. 4 Blackstone, *supra*, at \*196. At sentencing, Jeffreys complained that death was no longer available as a penalty and lamented that "a proportionable punishment of that crime can scarce by our law, as it now stands, be inflicted upon him." *Second Trial of Titus Oates*, 10 How. St. Tr. 1227, 1314 (K. B. 1685). The law would not stand in the way, however. The judges met, and, according to Jeffreys, were in unanimous agreement that "crimes of this nature are left to be punished according to the discretion of this court, so far as that the judgment extend not to life or member." *Ibid.* Another justice taunted Oates that "we have taken special care of you," *id.*, at 1316. The court then decreed that he should pay a fine of "1000 marks upon each Indictment," that he should be "stript of [his] Canonical Habits," that he should stand in the pillory annually at certain specified times and places, that on May 20 he should be whipped by "the common hangman" "from Aldgate to Newgate," that he should be similarly whipped on May 22 "from Newgate to Tyburn," and that he should be imprisoned for life. *Ibid.*

"The judges, as they believed, sentenced Oates to be scourged to death." 2 T. Macaulay, History of England 204 (1899) (hereinafter Macaulay). Accord, D. Ogg, England In The Reigns of James II and William III, pp. 154–155 (1984). Oates would not die, however. Four years later, and several months after the Declaration of Rights, he petitioned the House of Lords to set aside his sentence as illegal. 6 Macaulay 138–141. "Not a single peer ventured to affirm that the judgment was legal: but much was said about the odious character of the appellant," and the Lords affirmed the judgment. 6 *id.*, at 140–141. A minority of the Lords dissented, however, and their statement sheds light on the meaning of the "cruell and unusuall Punishments" clause:

"1st, [T]he King's Bench, being a Temporal Court, made it a Part of the Judgment, That Titus Oates, being a Clerk, should, for his said Perjuries, be divested of his canonical and priestly Habit . . . ; which is a Matter wholly out of their Power, belonging to the Ecclesiastical Courts only.

"2dly, [S]aid Judgments are barbarous, inhuman, and unchristian; and there is no Precedent to warrant the Punishments of whipping and committing to Prison for Life, for the Crime of Perjury; which yet were but Part of the Punishments inflicted upon him.

   .       .       .       .       .

"4thly, [T]his will be an Encouragement and Allowance for giving the like cruel, barbarous and illegal Judgments hereafter, unless this Judgment be reversed.

"5thly, . . . [T]hat the said Judgments were contrary to Law and ancient Practice, and therefore erroneous, and ought to be reversed.

"6thly, Because it is contrary to the Declaration, on the Twelfth of February last, . . . that excessive Bail ought not to be required, nor excessive Fines imposed, nor cruel nor unusual Punishments afflicted." 1 Journals of the House of Lords 367 (May 31, 1689), quoted in *Second Trial of Titus Oates, supra,* at 1325.

Oates' cause then aroused support in the House of Commons, whose members proceeded to pass a bill to annul the sentence. A "free conference" was ultimately convened in which representatives of the House of Commons attempted to persuade the Lords to reverse their position. See 6 Macaulay 143–145. Though this attempt was not successful, the Commons' report of the conference confirms that the "cruell and unusuall Punishments" clause was directed at the Oates case (among others) in particular, and at illegality, rather than disproportionality, of punishment in general.

"[T]he Commons had hoped, That, after the Declaration [of Rights] presented to their Majesties upon their

accepting the Crown (wherein their Lordships had joined with the Commons in complaining of the cruel and illegal Punishments of the last Reign; and in asserting it to be the ancient Right of the People of *England* that they should not be subjected to *cruel and unusual Punishments;* and that no Judgments to the Prejudice of the People in that kind ought in any wise to be drawn into Consequence, or Example); and after this Declaration had been so lately renewed in that Part of the Bill of Rights which the Lords have agreed to; they should not have seen Judgments of this Nature affirmed, and been put under a Necessity of sending up a Bill for reversing them; since those Declarations will not only be useless, but of pernicious Consequence to the People, if, so soon after, such Judgments as these stand affirmed, and be not taken to be cruel and illegal within the Meaning of those Declarations.

*"That the Commons had a particular Regard to these Judgments, amongst others, when that Declaration was first made; and must insist upon it,* That they are erroneous, cruel, illegal, and of ill Example to future Ages . . . .

. . . . .

"That it seemed no less plain, That the Judgments were cruel, and of ill Example to future Ages.

"That it was surely of ill Example for a Temporal Court to give Judgment, 'That a Clerk be divested of his Canonical Habits; and continue so divested during his Life.'

"That it was of ill Example, and illegal, That a Judgment of perpetual Imprisonment should be given in a Case, where there is no express Law to warrant it.

"It was of ill Example, and unusual, That an Englishman should be exposed upon a Pillory, so many times a Year, during his Life.

"That it was illegal, cruel, and of dangerous Example, That a Freeman should be whipped in such a barbarous manner, as, in Probability, would determine in Death.

．　　　　．　　　　．　　　　．　　　　．

"That this was avowed, when these Judgments was *[sic]* given by the then Lord Chief Justice of the King's Bench; who declared; 'That all the Judges had met; and unanimously agreed, That where the Subject was prosecuted at Common Law for a Misdemeanor, it was in the Discretion of the Court, to inflict what Punishment they pleased, not extending to Life, or Member.'

"That as soon as they had set up this Pretence to a discretionary Power, it was observable how they put it in Practice, not only in this, but in other Cases, and for other Offences, by inflicting such cruel and ignominious Punishments, as will be agreed to be far worse than Death itself to any Man who has a sense of Honour or Shame . . . ."   10 Journal of the House of Commons 247 (Aug. 2, 1689) (emphasis added).

In all these contemporaneous discussions, as in the prologue of the Declaration, a punishment is not considered objectionable because it is disproportionate,[4] but because it is "out of [the Judges'] Power," "contrary to Law and ancient practice," without "Precedents" or "express Law to warrant," "unusual," "illegal," or imposed by "Pretence to a discretionary Power."   Accord, 2 Macaulay 204 (observing that Oates' punishment, while deserved, was unjustified by law). Moreover, the phrase "cruell and unusuall" is treated as interchangeable with "cruel and illegal."   In other words, the

---

[4] Indeed, it is not clear that, by the standards of the age, Oates' sentence *was* disproportionate, given that his perjuries resulted in the deaths of 15 innocents.   Granucci suggests that it was not.   See Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839, 859, and n. 97 (1969).   And Macaulay observed that Oates' "sufferings, great as they might seem, had been trifling when compared with his crimes."   6 Macaulay 137.   See also 2 *id.*, at 203–204.

"illegall and cruell Punishments" of the Declaration's pro-
logue, see *supra*, at 969, are the same thing as the "cruell and
unusuall Punishments" of its body. (JUSTICE MARSHALL's
concurrence in *Furman* v. *Georgia*, 408 U. S., at 318, ob-
serves that an earlier draft of the body prohibited "illegal"
punishments, and that the change "appears to be inadver-
tent." See also 1 Chitty 712 (describing Declaration of
Rights as prohibiting "cruel and illegal" punishments).) In
the legal world of the time, and in the context of restricting
punishment determined by the Crown (or the Crown's
judges), "illegall" and "unusuall" were identical for practical
purposes. Not all punishments were specified by statute;
many were determined by the common law. Departures
from the common law were lawful only if authorized by stat-
ute. See 1 J. Stephen, A History of the Criminal Law of
England 489–490 (1883); 1 Chitty 710. A requirement that
punishment not be "unusuall"—that is, not contrary to
"usage" (Lat. "usus") or "precedent"—was primarily a re-
quirement that judges pronouncing sentence remain within
the bounds of common-law tradition. 1 *id.*, at 710–712;
*Ingraham* v. *Wright*, 430 U. S., at 665 (English provision
aimed at "judges acting beyond their lawful authority");
Granucci, 57 Calif. L. Rev., at 859; cf. 4 W. Blackstone, Com-
mentaries *371–*373.

In sum, we think it most unlikely that the English Cruell
and Unusuall Punishments Clause was meant to forbid "dis-
proportionate" punishments. There is even less likelihood
that proportionality of punishment was one of the traditional
"rights and privileges of Englishmen" apart from the Dec-
laration of Rights, which happened to be included in the
Eighth Amendment. Indeed, even those scholars who be-
lieve the principle to have been included within the Declara-
tion of Rights do not contend that such a prohibition was re-
flected in English practice—nor could they. See Granucci,

*supra,* at 847.[5]  For, as we observed in *Woodson* v. *North Carolina,* 428 U. S. 280, 289 (1976), in 1791, England punished over 200 crimes with death.  See also 1 Stephen, *supra,* at 458, 471–472 (until 1826, all felonies, except mayhem and petty larceny, were punishable by death).  By 1830 the class of offenses punishable by death was narrowed to include "only" murder; attempts to murder by poisoning, stabbing, shooting, etc.; administering poison to procure abortion; sodomy; rape; statutory rape; and certain classes of forgery.  See 1 Stephen, *supra,* at 473–474.  It is notable that, during his discussion of English capital punishment reform, Stephen does not once mention the Cruell and Unusuall Punishments Clause, though he was certainly aware of it.  See 1 Stephen, *supra,* at 489–490.  Likewise, in his discussion of the suitability of punishments, Blackstone does not mention the Declaration.  See 4 Blackstone, *supra,* at *9–*19.

### C

Unless one accepts the notion of a blind incorporation, however, the ultimate question is not what "cruell and unusuall punishments" meant in the Declaration of Rights, but what its meaning was to the Americans who adopted the Eighth Amendment.  Even if one assumes that the Founders knew the precise meaning of that English antecedent, but see Granucci, *supra,* at 860–865, a direct transplant of the English meaning to the soil of American constitutionalism would in any case have been impossible.  There were no common-law punishments in the federal system, see *United States* v. *Hudson,* 7 Cranch 32 (1812), so that the provision must have been meant as a check not upon judges but upon

---

[5] Contrary to JUSTICE WHITE's suggestion, *post,* at 1011–1012, n. 1, Granucci provides little (if any) direct evidence that the Declaration of Rights embodied a proportionality principle.  He simply reasons that, because English law was concerned with proportionality, the Declaration of Rights must have embodied such a principle.  Granucci, *supra,* at 844–847.

the Legislature. See, *e. g.*, *In re Kemmler*, 136 U. S. 436, 446–447 (1890).

Wrenched out of its common-law context, and applied to the actions of a legislature, the word "unusual" could hardly mean "contrary to law." But it continued to mean (as it continues to mean today) "such as [does not] occu[r] in ordinary practice," Webster's American Dictionary (1828), "[s]uch as is [not] in common use," Webster's Second International Dictionary 2807 (1954). According to its terms, then, by forbidding "cruel *and unusual* punishments," see *Stanford* v. *Kentucky*, 492 U. S. 361, 378 (1989) (plurality opinion); *In re Kemmler, supra,* at 446–447, the Clause disables the Legislature from authorizing particular forms or "modes" of punishment—specifically, cruel methods of punishment that are not regularly or customarily employed. *E. g., Louisiana ex rel. Francis* v. *Resweber*, 329 U. S. 459, 464 (1947) (plurality opinion); *In re Kemmler, supra,* at 446–447. See also *United States* v. *Collins*, 25 F. Cas. 545 (No. 14,836) (CC R. I. 1854) (Curtis, J.).

The language bears the construction, however—and here we come to the point crucial to resolution of the present case—that "cruelty and unusualness" are to be determined not solely with reference to the punishment at issue ("Is life imprisonment a cruel and unusual punishment?") but with reference to the crime for which it is imposed as well ("Is life imprisonment cruel and unusual punishment for possession of unlawful drugs?"). The latter interpretation would make the provision a form of proportionality guarantee.[6] The arguments against it, however, seem to us conclusive.

---

[6] JUSTICE WHITE apparently agrees that the Clause outlaws particular "modes" of punishment. He goes on to suggest, however, that because the Founders did not specifically *exclude* a proportionality component from words that "could reasonably be construed to include it," the Eighth Amendment *must* prohibit disproportionate punishments as well. *Post,* at 1011. Surely this is an extraordinary method for determining what restrictions upon democratic self-government the Constitution contains. It seems to us that our task is not merely to identify various meanings that

First of all, to use the phrase "cruel and unusual punishment" to describe a requirement of proportionality would have been an exceedingly vague and oblique way of saying what Americans were well accustomed to saying more directly. The notion of "proportionality" was not a novelty (though then as now there was little agreement over what it entailed). In 1778, for example, the Virginia Legislature narrowly rejected a comprehensive "Bill for Proportioning Punishments" introduced by Thomas Jefferson. See 4 W. Blackstone, Commentaries 18 (H. Tucker ed. 1803) (discussing efforts at reform); 1 Writings of Thomas Jefferson 218–239 (A. Lipscomb ed. 1903). Proportionality provisions had been included in several State Constitutions. See, e. g., Pa. Const., § 38 (1776) (punishments should be "in general more proportionate to the crimes"); S. C. Const., Art. XL (1778) (same); N. H. Bill of Rights, Art. XVIII (1784) ("[A]ll penalties ought to be proportioned to the nature of the offence"). There is little doubt that those who framed, proposed, and ratified the Bill of Rights were aware of such provisions,[7] yet chose not to replicate them. Both the New Hampshire Constitution, adopted 8 years before ratification of the Eighth Amendment, and the Ohio Constitution, adopted 12 years after, contain, in separate provisions, a prohibition of "cruel and unusual punishments" ("cruel or unusual," in New Hampshire's case) *and* a requirement that

---

the text "could reasonably" bear, and then impose the one that from a policy standpoint pleases us best. Rather, we are to strive as best we can to select from among the various "reasonable" possibilities *the most plausible* meaning. We do not bear the burden of "proving an affirmative decision against the proportionality component," *ibid.;* rather, JUSTICE WHITE bears the burden of proving an affirmative decision in its favor. For if the Constitution does not affirmatively contain such a restriction, the matter of proportionality is left to state constitutions or to the democratic process.

[7] Printed collections of State Constitutions were available to the Founders, see The Federalist No. 24, p. 159, n. (C. Rossiter ed. 1961) (A. Hamilton); see also *id.,* No. 47, pp. 304–307 (J. Madison) (comparing constitutions of all 13 States).

"all penalties ought to be proportioned to the nature of the offence." N. H. Bill of Rights, Arts. XVIII, XXXIII (1784). Ohio Const., Art. VIII, §§ 13, 14 (1802).[8]

Secondly, it would seem quite peculiar to refer to cruelty and unusualness *for the offense in question,* in a provision having application only to a new government that had never before defined offenses, and that would be defining new and peculiarly national ones. Finally, and most conclusively, as we proceed to discuss, the fact that what was "cruel and unusual" under the Eighth Amendment was to be determined without reference to the particular offense is confirmed by all available evidence of contemporary understanding.[9]

---

[8] The New Hampshire proportionality provision, by far the most detailed of the *genre,* read: "All penalties ought to be proportioned to the nature of the offence. No wise legislature will affix the same punishment to the crimes of theft, forgery and the like, which they do to those of murder and treason; where the same undistinguishing severity is exerted against all offences; the people are led to forget the real distinction in the crimes themselves, and to commit the most flagrant with as little compunction as they do those of the lightest dye: For the same reason a multitude of sanguinary laws is both impolitic and unjust. The true design of all punishments being to reform, not to exterminate, mankind." N. H. Const., Pt. I, Art. XVIII (1784).

The Ohio provision copied that of New Hampshire.

[9] JUSTICE WHITE suggests that because the Framers prohibited "excessive fines" (which he asserts, and we will assume for the sake of argument, means "disproportionate fines"), they must have meant to prohibit "excessive" punishments as well. *Post,* at 1009. This argument apparently did not impress state courts in the 19th century, and with good reason. The logic of the matter is quite the opposite. If "cruel and unusual punishments" included disproportionate punishments, the separate prohibition of disproportionate fines (which are certainly punishments) would have been entirely superfluous. When two parts of a provision (the Eighth Amendment) use different language to address the same or similar subject matter, a difference in meaning is assumed. See *Walton* v. *Arizona,* 497 U. S. 639, 669–670 (1990) (SCALIA, J., concurring in part and concurring in judgment).

But, it might be argued, why would any rational person be careful to forbid the disproportionality of fines but provide no protection against the disproportionality of more severe punishments? Does not the one suggest

·The Eighth Amendment received little attention during the proposal and adoption of the Federal Bill of Rights. However, what evidence exists from debates at the state ratifying conventions that prompted the Bill of Rights as well as the floor debates in the First Congress which proposed it "confirm[s] the view that the cruel and unusual punishments clause was directed at prohibiting certain *methods* of punishment." Granucci, 57 Calif. L. Rev., at 842 (emphasis added). See Schwartz, Eighth Amendment Proportionality Analysis and the Compelling Case of William Rummel, 71 J. Crim. L. & Criminology 378, 378–382 (1980); Welling & Hipfner, Cruel and Unusual?: Capital Punishment in Canada, 26 U. Toronto L. J. 55, 61 (1976).

In the January 1788 Massachusetts Convention, for example, the objection was raised that Congress was

> "nowhere restrained from inventing the most *cruel and unheard-of* punishments, and annexing them to crimes; and there is no constitutional check on [it], but that *racks* and *gibbets* may be amongst the most mild instruments of [its] discipline." 2 J. Elliot, Debates on the Federal Constitution 111 (2d ed. 1854) (emphasis added).

---

the existence of the other? Not at all. There is good reason to be concerned that fines, uniquely of all punishments, will be imposed in a measure out of accord with the penal goals of retribution and deterrence. Imprisonment, corporal punishment, and even capital punishment cost a State money; fines are a source of revenue. As we have recognized in the context of other constitutional provisions, it makes sense to scrutinize governmental action more closely when the State stands to benefit. See *United States Trust Co. of N. Y.* v. *New Jersey*, 431 U. S. 1, 25–26 (1977); *Perry* v. *United States*, 294 U. S. 330, 350–351 (1935). (We relied upon precisely the lack of this incentive for abuse in holding that "punitive damages" were not "fines" within the meaning of the Eighth Amendment. *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 271–276 (1989)). Thus, some early State Constitutions prohibited excessive fines without placing any restrictions on other modes of punishment. *E. g.*, Conn. Declaration of Rights, Art. I, § 13 (1818) (prohibiting excessive fines only); Ga. Const., Art. LIX (1777) (same).

In the Virginia Convention, Patrick Henry decried the absence of a bill of rights, stating:

> "What says our [Virginia] Bill of Rights?—'that excessive bail ought not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' . . .
>
> "In this business of legislation, your members of Congress will loose the restriction of not imposing excessive fines, demanding excessive bail, and inflicting cruel and unusual punishments. These are prohibited by your declaration of rights. What has distinguished our ancestors?—That they would not admit of tortures, or cruel and barbarous punishment." 3 *id.*, at 447.

The actions of the First Congress, which are of course persuasive evidence of what the Constitution means, *Marsh* v. *Chambers*, 463 U. S. 783, 788–790 (1983); *Carroll* v. *United States*, 267 U. S. 132, 150–152 (1925); cf. *McCulloch* v. *Maryland*, 4 Wheat. 316, 401–402 (1819), belie any doctrine of proportionality. Shortly after this Congress proposed the Bill of Rights, it promulgated the Nation's first Penal Code. See 1 Stat. 112–119 (1790). As the then-extant New Hampshire Constitution's proportionality provision didactically observed, "[n]o wise legislature"—that is, no legislature attuned to the principle of proportionality—"will afix the same punishment to the crimes of theft, forgery and the like, which they do to those of murder and treason," N. H. Const., Pt. I, Art. XVIII (1784). Jefferson's Bill For Proportioning Crimes and Punishments punished murder and treason by death; counterfeiting of public securities by forfeiture of property plus six years at hard labor, and "run[ning] away with any sea-vessel or goods laden on board thereof" by treble damages to the victim and five years at hard labor. See 1 Writings of Thomas Jefferson, at 220–222, 229–231 (footnote omitted). Shortly after proposing the Bill of Rights, the First Congress ignored these teachings. It punished forgery of United States securities, "run[ning] away with [a] ship or vessel, or any goods or merchandise to the value

of fifty dollars," treason, and murder on the high seas with the same penalty: death by hanging. 1 Stat. 114. The law-books of the time are devoid of indication that anyone considered these newly enacted penalties unconstitutional by virtue of their disproportionality. Cf. *United States* v. *Tully*, 28 F. Cas. 226 (No. 16,545) (CC Mass. 1812) (Story and Davis, JJ.) (Force or threat thereof not an element of "run[n]ing away with [a] ship or vessel").

The early commentary on the Clause contains no reference to disproportionate or excessive sentences, and again indicates that it was designed to outlaw particular *modes* of punishment. One commentator wrote:

> "The prohibition of cruel and unusual punishments, marks the improved spirit of the age, which would not tolerate the use of the rack or the stake, or any of those horrid modes of torture, devised by human ingenuity for the gratification of fiendish passion." J. Bayard, A Brief Exposition of the Constitution of the United States 154 (2d ed. 1840).

Another commentator, after explaining (in somewhat convoluted fashion) that the "spirit" of the Excessive Bail and Excessive Fines Clauses forbade excessive imprisonments, went on to add:

> "Under the [Eighth] amendment the infliction of cruel and unusual punishments, is also prohibited. The various barbarous and cruel punishments inflicted under the laws of some other countries, and which profess not to be behind the most enlightened nations on earth in civilization and refinement, furnish sufficient reasons for this express prohibition. Breaking on the wheel, flaying alive, rending assunder with horses, various species of horrible tortures inflicted in the inquisition, maiming, mutilating and scourging to death, are wholly alien to the spirit of our humane general constitution." B. Oliver, The Rights of An American Citizen 186 (1832).

Chancellor Kent, in a paragraph of his Commentaries arguing that capital punishment "ought to be confined to the few cases of the most atrocious character," does not suggest that the "Cruel and Unusual Punishments" Clauses of State or Federal Constitutions require such proportionality—even though the very paragraph in question begins with the statement that "cruel and unusual punishments are universally condemned." 2 J. Kent, Commentaries on American Law 10–11 (1827). And Justice Story had this to say:

> "The provision [the Eighth Amendment] would seem wholly unnecessary in a free government, since it is scarcely possible, that any department of such a government should authorize, or justify such atrocious conduct. It was, however, adopted as an admonition to all departments of the national government, to warn them against such violent proceedings, as had taken place in England in the arbitrary reigns of some of the Stuarts." 3 J. Story, Commentaries on the Constitution of the United States § 1896 (1833).

Many other Americans apparently agreed that the Clause only outlawed certain *modes* of punishment: During the 19th century several States ratified constitutions that prohibited "cruel and unusual," "cruel or unusual," or simply "cruel" punishments *and* required *all* punishments to be proportioned to the offense. Ohio Const., Art. VIII, §§ 13, 14 (1802); Ind. Const., Art. I, §§ 15–16 (1816); Me. Const., Art. I, § 9 (1819); R. I. Const., Art. I, § 8 (1842); W. Va. Const., Art. II, § 2 (1861–1863); Ga. Const., Art. I, §§ 16, 21 (1868).

Perhaps the most persuasive evidence of what "cruel and unusual" meant, however, is found in early judicial constructions of the Eighth Amendment and its state counterparts. An early (perhaps the earliest) judicial construction of the federal provision is illustrative. In *Barker* v. *People*, 20 Johns. *457 (N. Y. Sup. Ct. 1823), aff'd, 3 Cow. 686 (N. Y. 1824), the defendant, upon conviction of challenging another to a duel, had been disenfranchised. Chief Justice Spencer

assumed that the Eighth Amendment applied to the States, and in finding that it had not been violated considered the proportionality of the punishment irrelevant. "The disenfranchisement of a citizen," he said, "is not an unusual punishment; it was the consequence of treason, and of infamous crimes, and it was altogether discretionary in the legislature to extend that punishment to other offences." *Barker* v. *People, supra,* at *459.

Throughout the 19th century, state courts interpreting state constitutional provisions with identical or more expansive wording (*i. e.,* "cruel *or* unusual") concluded that these provisions did not proscribe disproportionality but only certain modes of punishment. For example, in *Aldridge* v. *Commonwealth,* 4 Va. 447 (1824), the General Court of Virginia had occasion to interpret the cruel and unusual punishments clause that was the direct ancestor of our federal provision, see *supra,* at 966. In rejecting the defendant's claim that a sentence of so many as 39 stripes violated the Virginia Constitution, the court said:

> "As to the ninth section of the Bill of Rights, denouncing cruel and unusual punishments, we have no notion that it has any bearing on this case. That provision was never designed to control the Legislative right to determine *ad libitum* upon the *adequacy* of punishment, but is merely applicable to the modes of punishment. . . . [T]he best heads and hearts of the land of our ancestors, had long and loudly declaimed against the wanton cruelty of many of the punishments practised in other countries; and this section in the Bill of Rights was framed effectually to exclude these, so that no future Legislature, in a moment perhaps of great and general excitement, should be tempted to disgrace our Code by the introduction of any of those odious modes of punishment." 4 Va., at 449–450 (emphasis in original).

Accord, *Commonwealth* v. *Hitchings,* 71 Mass. 482, 486 (1855); *Garcia* v. *Territory,* 1 N. M. 415, 417–419 (1869);

*Whitten* v. *Georgia,* 47 Ga. 297, 301 (1872); *Cummins* v. *People,* 42 Mich. 142, 143–144, 3 N. W. 305 (1879); *State* v. *Williams,* 77 Mo. 310, 312–313 (1883); *State* v. *White,* 44 Kan. 514, 520–521, 25 P. 33, 34–35 (1890); *People* v. *Morris,* 80 Mich. 634, 638, 45 N. W. 591, 592 (1890); *Hobbs* v. *State,* 133 Ind. 404, 408–410, 32 N. E. 1019, 1020–1021 (1893); *State* v. *Hogan,* 63 Ohio St. 202, 218, 58 N. E. 572, 575 (1900); see also *In re Bayard,* 25 Hun. 546, 549–550 (N. Y. 1881). In the 19th century, judicial agreement that a "cruel and unusual" (or "cruel or unusual") provision did not constitute a proportionality requirement appears to have been universal.[10] One case, late in the century, suggested in dictum, not a full-

---

[10] Neither *State* v. *Driver,* 78 N. C. 423 (1878), nor *State ex rel. Garvey* v. *Whitaker,* 48 La. 527, 19 So. 457 (1896), is to the contrary. They are examples of applying, not a proportionality principle, but rather the principle (curiously in accord with the original meaning of the phrase in the English Declaration of Rights, discussed above) that a punishment is "cruel and unusual" if it is illegal because not sanctioned by common law or statute. In *Driver,* the court had imposed a sentence of five years in a county jail for the common-law offense of assault and battery, for which no statutory penalty had been established. The North Carolina Supreme Court held the sentence to violate the State's "cruel or unusual punishment" provision because a county jail is "a close prison, where life is soon in jeopardy," and no prisoner had *ever* "been imprisoned for five years in a County jail for *any* crime however aggravated." 78 N. C., at 425, 426–427. A subsequent North Carolina case makes it clear that when the legislature has prescribed a penalty of a traditional mode, the penalty's severity for the offense in question cannot violate the State's "cruel or unusual punishment" clause. *State* v. *Blake,* 157 N. C. 608, 611, 72 S. E. 1080, 1081–1082 (1911).

In *Garvey,* the defendants were sentenced to nearly six years in jail for trespassing on public property. The sentence prescribed by the relevant city ordinance was 30 days, but the defendants' 1-hour 40-minute occupation had been made the subject of 72 separate counts, "each offence embracing only one and one-half minutes and one offence following after the other immediately and consecutively," 48 La., at 533, 19 So., at 459. The Louisiana Supreme Court found the sentence to have been cruel and unusual "considering the offence to have been a continuing one," *ibid.* We think it a fair reading of the case that the sentence was cruel and unusual because it was illegal.

fledged proportionality principle, but at least the power of the courts to intervene "in very extreme cases, where the punishment proposed is so severe and out of proportion to the offense as to shock public sentiment and violate the judgment of reasonable people." *State* v. *Becker*, 3 S. D. 29, 41, 51 N. W. 1018, 1022 (1892). That case, however, involved a constitutional provision proscribing all punishments that were merely "cruel," S. D. Const., Art. VI, § 23 (1889). A few decisions early in the present century cited it (again in dictum) for the proposition that a sentence "so out of proportion to the offense . . . as to 'shock public sentiment and violate the judgment of reasonable people'" would be "cruel and unusual." *Jackson* v. *United States*, 102 F. 473, 488 (CA9 1900); *Territory* v. *Ketchum*, 10 N. M. 718, 723, 65 P. 169, 171 (1901).

## II

We think it enough that those who framed and approved the Federal Constitution chose, for whatever reason, not to include within it the guarantee against disproportionate sentences that some State Constitutions contained. It is worth noting, however, that there was good reason for that choice—a reason that reinforces the necessity of overruling *Solem.* While there are relatively clear historical guidelines and accepted practices that enable judges to determine which *modes* of punishment are "cruel and unusual," *proportionality* does not lend itself to such analysis. Neither Congress nor any state legislature has ever set out with the objective of crafting a penalty that is "disproportionate"; yet as some of the examples mentioned above indicate, many enacted dispositions seem to be so—because they were made for other times or other places, with different social attitudes, different criminal epidemics, different public fears, and different prevailing theories of penology. This is not to say that there are no absolutes; one can imagine extreme examples that no rational person, in no time or place, could accept. But for the same reason these examples are easy to decide, they are

certain never to occur.[11] The real function of a constitutional proportionality principle, if it exists, is to enable judges to evaluate a penalty that *some* assemblage of men and women *has* considered proportionate—and to say that it is not. For that real-world enterprise, the standards seem so inadequate that the proportionality principle becomes an invitation to imposition of subjective values.

This becomes clear, we think, from a consideration of the three factors that *Solem* found relevant to the proportionality determination: (1) the inherent gravity of the offense, (2) the

---

[11] JUSTICE WHITE argues that the Eighth Amendment must contain a proportionality principle because otherwise legislatures could "mak[e] overtime parking a felony punishable by life imprisonment." *Post*, at 1018. We do not in principle oppose the "parade of horribles" form of argumentation, see Scalia, Assorted Canards of Contemporary Legal Analysis, 40 Case W. Res. L. Rev. 581, 590–593 (1989–1990); but its strength is in direct proportion to (1) the certitude that the provision in question was meant to exclude the very evil represented by the imagined parade, and (2) the probability that the parade will in fact materialize. Here, for the reasons we have discussed, there is no cause to believe that the provision was meant to exclude the evil of a disproportionate punishment. JUSTICE WHITE's argument has force only for those who believe that the Constitution prohibited everything that is intensely undesirable—which is an obvious fallacy, see Art. I, § 9 (implicitly permitting slavery); Monaghan, Our Perfect Constitution, 56 N. Y. U. L. Rev. 353 (1981). Nor is it likely that the horrible example imagined would ever in fact occur, unless, of course, overtime parking should one day become an arguably major threat to the common good, and the need to deter it arguably critical—at which time the Members of this Court would probably disagree as to whether the punishment really *is* "disproportionate," even as they disagree regarding the punishment for possession of cocaine today. As Justice Frankfurter reminded us, "[t]he process of Constitutional adjudication does not thrive on conjuring up horrible possibilities that never happen in the real world and devising doctrines sufficiently comprehensive in detail to cover the remotest contingency." *New York* v. *United States*, 326 U. S. 572, 583 (1946). It seems to us no more reasonable to hold that the Eighth Amendment forbids "disproportionate punishment" because otherwise the State could impose life imprisonment for a parking offense than it would be to hold that the Takings Clause forbids "disproportionate taxation" because otherwise the State could tax away all income above the subsistence level.

sentences imposed for similarly grave offenses in the same jurisdiction, and (3) sentences imposed for the same crime in other jurisdictions. 463 U. S., at 290–291. As to the first factor: Of course some offenses, involving violent harm to human beings, will always and everywhere be regarded as serious, but that is only half the equation. The issue is *what else* should be regarded to be *as serious* as these offenses, or even to be *more serious* than some of them. On that point, judging by the statutes that Americans have enacted, there is enormous variation—even within a given age, not to mention across the many generations ruled by the Bill of Rights. The State of Massachusetts punishes sodomy more severely than assault and battery, compare Mass. Gen. Laws § 272:34 (1988) ("not more than twenty years" in prison for sodomy) with § 265:13A ("not more than two and one half years" in prison for assault and battery); whereas in several States, sodomy is not unlawful *at all*. In Louisiana, one who assaults another with a dangerous weapon faces the same maximum prison term as one who removes a shopping basket "from the parking area or grounds of any store . . . without authorization." La. Rev. Stat. Ann. §§ 14:37, 14:68.1 (West 1986). A battery that results in "protracted and obvious disfigurement" merits imprisonment "for not more than five years," § 14:34.1, one half the maximum penalty for theft of livestock or an oilfield seismograph, §§ 14:67.1, 14:67.8. We may think that the First Congress punished with clear disproportionality when it provided up to seven years in prison and up to $1,000 in fine for "cut[ting] off the ear or ears, . . . cut[ting] out or disabl[ing] the tongue, . . . put[ting] out an eye, . . . cut[ting] off . . . any limb or member of any person with intention . . . to maim or disfigure," but provided the death penalty for "run[ning] away with [a] ship or vessel, or any goods or merchandise to the value of fifty dollars." Act of Apr. 30, 1790, ch. 9, §§ 8, 13, 1 Stat. 113–115. But then perhaps the citizens of 1791 would think that today's Congress punishes with clear disproportionality when it sanc-

tions "assault by . . . wounding" with up to six months in prison, 18 U. S. C. § 113(d), unauthorized reproduction of the "Smokey Bear" character or name with the same penalty, 18 U. S. C. § 711, offering to barter a migratory bird with up to two years in prison, 16 U. S. C. § 707(b), and purloining a "key suited to any lock adopted by the Post Office Department" with a prison term of up to 10 years, 18 U. S. C. § 1704. Perhaps both we and they would be right, but the point is that there are no textual or historical standards for saying so.

The difficulty of assessing gravity is demonstrated in the very context of the present case: Petitioner acknowledges that a mandatory life sentence might not be "grossly excessive" for possession of cocaine with intent to distribute, see *Hutto* v. *Davis*, 454 U. S. 370 (1982). But surely whether it is a "grave" offense merely to possess a significant quantity of drugs—thereby facilitating distribution, subjecting the holder to the temptation of distribution, and raising the possibility of theft by others who might distribute—depends entirely upon how odious and socially threatening one believes drug use to be. Would it be "grossly excessive" to provide life imprisonment for "mere possession" of a certain quantity of heavy weaponry? If not, then the only issue is whether the possible dissemination of drugs can be as "grave" as the possible dissemination of heavy weapons. Who are we to say no? The members of the Michigan Legislature, and not we, know the situation on the streets of Detroit.

The second factor suggested in *Solem* fails for the same reason. One cannot compare the sentences imposed by the jurisdiction for "similarly grave" offenses if there is no objective standard of gravity. Judges will be comparing what *they* consider comparable. Or, to put the same point differently: When it happens that two offenses judicially determined to be "similarly grave" receive significantly *dissimilar penalties, what follows is not that the harsher penalty is unconstitutional, but merely that the legislature does not

share the judges' view that the offenses are similarly grave. Moreover, even if "similarly grave" crimes could be identified, the penalties for them would not necessarily be comparable, since there are many other justifications for a difference. For example, since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties. Grave crimes of the sort that will not be deterred by penalty may warrant substantially lower penalties, as may grave crimes of the sort that are normally committed once in a lifetime by otherwise law-abiding citizens who will not profit from rehabilitation. Whether these differences will occur, and to what extent, depends, of course, upon the weight the society accords to deterrence and rehabilitation, rather than retribution, as the objective of criminal punishment (which is an eminently legislative judgment). In fact, it becomes difficult even to speak intelligently of "proportionality," once deterrence and rehabilitation are given significant weight. Proportionality is inherently a retributive concept, and perfect proportionality is the talionic law. Cf. Bill For Proportioning Punishments, 1 Writings of Thomas Jefferson, at 218, 228–229 ("[W]hoever . . . shall maim another, or shall disfigure him . . . shall be maimed or disfigured in like sort").

As for the third factor mentioned by *Solem*—the character of the sentences imposed by other States for the same crime—it must be acknowledged that that can be applied with clarity and ease. The only difficulty is that it has no conceivable relevance to the Eighth Amendment. That a State is entitled to treat with stern disapproval an act that other States punish with the mildest of sanctions follows *a fortiori* from the undoubted fact that a State may criminalize an act that other States do not criminalize *at all.* Indeed, a State may criminalize an act that other States choose to *reward*—punishing, for example, the killing of endangered wild animals for which other States are offering a bounty. What

greater disproportion could there be than that? "Absent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State." *Rummel*, 445 U. S., at 282. Diversity not only in policy, but in the means of implementing policy, is the very *raison d'être* of our federal system. Though the different needs and concerns of other States may induce them to treat simple possession of 672 grams of cocaine as a relatively minor offense, see Wyo. Stat. § 35–7–1031(c) (1988) (6 months); W. Va. Code § 60A–4–401(c) (1989) (6 months), nothing in the Constitution requires Michigan to follow suit. The Eighth Amendment is not a ratchet, whereby a temporary consensus on leniency for a particular crime fixes a permanent constitutional maximum, disabling the States from giving effect to altered beliefs and responding to changed social conditions.

## III

Our 20th-century jurisprudence has not remained entirely in accord with the proposition that there is no proportionality requirement in the Eighth Amendment, but neither has it departed to the extent that *Solem* suggests. In *Weems* v. *United States*, 217 U. S. 349 (1910), a government disbursing officer convicted of making false entries of small sums in his account book was sentenced by Philippine courts to 15 years of *cadena temporal*. That punishment, based upon the Spanish Penal Code, called for incarceration at "'hard and painful labor'" with chains fastened to the wrists and ankles at all times. Several "accessor[ies]" were superadded, including permanent disqualification from holding any position of public trust, subjection to "[government] surveillance" for life, and "civil interdiction," which consisted of deprivation of "'the rights of parental authority, guardianship of person or property, participation in the family council[, etc.]'" *Weems, supra,* at 364.

Justice McKenna, writing for himself and three others, held that the imposition of *cadena temporal* was "Cruel and Unusual Punishment." (Justice White, joined by Justice Holmes, dissented.) That holding, and some of the reasoning upon which it was based, was not at all out of accord with the traditional understanding of the provision we have described above. The punishment was both (1) severe *and* (2) unknown to Anglo-American tradition. As to the former, Justice McKenna wrote:

> "No circumstance of degradation is omitted. It may be that even the cruelty of pain is not omitted. He must bear a chain night and day. He is condemned to painful as well as hard labor. What painful labor may mean we have no exact measure. It must be something more than hard labor. It may be hard labor pressed to the point of pain." 217 U. S., at 366–367.

As to the latter:

> "It has no fellow in American legislation. Let us remember that it has come to us from a government of a different form and genius from ours. It is cruel in its excess of imprisonment and that which accompanies and follows imprisonment. It is unusual in its character." *Id.*, at 377.

Other portions of the opinion, however, suggest that mere disproportionality, by itself, might make a punishment cruel and unusual:

> "Such penalties for such offenses amaze those who . . . believe that it is a precept of justice that punishment for crime should be graduated and proportioned to offense." *Id.*, at 366–367.

> "[T]he inhibition [of the Cruel and Unusual Punishments Clause] was directed, not only against punishments which inflict torture, 'but against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged.'" *Id.*, at 371,

quoting *O'Neil* v. *Vermont*, 144 U. S. 323, 339–340 (1892) (Field, J., dissenting).

Since it contains language that will support either theory, our later opinions have used *Weems*, as the occasion required, to represent either the principle that "the Eighth Amendment bars not only those punishments that are 'barbaric' but also those that are 'excessive' in relation to the crime committed," *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977), or the principle that only a "unique . . . punishmen[t]," a form of imprisonment different from the "more traditional forms . . . imposed under the Anglo-Saxon system," can violate the Eighth Amendment, *Rummel, supra,* at 274–275.   If the proof of the pudding is in the eating, however, it is hard to view *Weems* as announcing a constitutional requirement of proportionality, given that it did not produce a decision implementing such a requirement, either here or in the lower federal courts, for six decades.   In *Graham* v. *West Virginia*, 224 U. S. 616 (1912), for instance, we evaluated (and rejected) a claim that life imprisonment for a third offense of horse theft was "cruel and unusual."   We made no mention of *Weems*, although the petitioner had relied upon that case.[12]   See also *Badders* v. *United States*, 240 U. S. 391 (1916).

Opinions in the Federal Courts of Appeals were equally devoid of evidence that this Court had announced a general proportionality principle.   Some evaluated "cruel and unusual punishment" claims without reference to *Weems*.   See, *e. g.*, *Bailey* v. *United States*, 284 F. 126 (CA7 1922); *Tincher* v. *United States*, 11 F. 2d 18, 21 (CA4 1926).   Others continued to echo (in dictum) variants of the dictum in *State* v. *Becker*, 3 S. D. 29, 51 N. W. 1018 (1892), to the effect that courts will not interfere with punishment unless it is "manifestly cruel

---

[12] At the time we decided *Graham*, it was not clear that the Eighth Amendment was applicable to the States, but our opinion obviously assumed that it was.   See *Rummel* v. *Estelle*, 445 U. S. 263, 277, n. 13 (1980).

and unusual," and cited *Weems* for the proposition that sentences imposed within the limits of a statute "ordinarily will not be regarded as cruel and unusual." See, *e. g.*, *Sansone* v. *Zerbst*, 73 F. 2d 670, 672 (CA10 1934); *Bailey* v. *United States*, 74 F. 2d 451, 453 (CA10 1934).[13] Not until more than half a century after *Weems* did the Circuit Courts begin performing proportionality analysis. *E. g.*, *Hart* v. *Coiner*, 483 F. 2d 136 (CA4 1973). Even then, some continued to state that "[a] sentence within the statutory limits is not cruel and unusual punishment." *Page* v. *United States*, 462 F. 2d 932, 935 (CA3 1972). Accord, *Rener* v. *Beto*, 447 F. 2d 20, 23 (CA5 1971); *Anthony* v. *United States*, 331 F. 2d 687, 693 (CA9 1964).

The first holding of this Court unqualifiedly applying a requirement of proportionality to criminal penalties was issued 185 years after the Eighth Amendment was adopted.[14] In

---

[13] State Supreme Courts reacted to *Weems* in various ways. The Virginia Supreme Court suggested that, since only four Justices had joined the majority opinion, the proportionality question "may be fairly said to be still an open question in so far as the authority of the Supreme Court is concerned." *Hart* v. *Commonwealth*, 131 Va. 726, 745, 109 S. E. 582, 588 (1921). Cf. *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.*, 419 U. S. 601, 616–619 (1975) (BLACKMUN, J., dissenting). The Supreme Court of Indiana apparently thought *Weems* to be in accord with the traditional view expressed in *Hobbs* v. *State*, 133 Ind. 404, 32 N. E. 1019 (1893). See *Kistler* v. *State*, 190 Ind. 149, 158, 129 N. E. 625, 628 (1921). The North Carolina Supreme Court, after stating that *Weems* contained "an interesting historical review," went on to hold that, under North Carolina's "similar provision," punishment fixed by the legislature "cannot be excessive." *State* v. *Blake*, 157 N. C. 608, 611, 72 S. E. 1080, 1081–1082 (1911).

[14] In *Robinson* v. *California*, 370 U. S. 660 (1962), the Court invalidated a 90-day prison sentence for the crime of being "addicted to the use of narcotics." The opinion does not cite *Weems* and rests upon the proposition that "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold," 370 U. S., at 667. Despite the Court's statement to the contrary in *Solem* v. *Helm*, 463 U. S., at 287, there is no reason to believe that the decision was an application of the principle of proportionality. See *Ingraham* v. *Wright*, 430 U. S. 651, 667 (1977).

*Coker* v. *Georgia, supra,* the Court held that, because of the disproportionality, it was a violation of the Cruel and Unusual Punishments Clause to impose capital punishment for rape of an adult woman. Five years later, in *Enmund* v. *Florida,* 458 U. S. 782 (1982), we held that it violates the Eighth Amendment, because of disproportionality, to impose the death penalty upon a participant in a felony that results in murder, without any inquiry into the participant's intent to kill. *Rummel,* 445 U. S. 263 (1980), treated this line of authority as an aspect of our death penalty jurisprudence, rather than a generalizable aspect of Eighth Amendment law. We think that is an accurate explanation, and we reassert it. Proportionality review is one of several respects in which we have held that "death is different," and have imposed protections that the Constitution nowhere else provides. See, *e. g., Turner* v. *Murray,* 476 U. S. 28, 36–37 (1986); *Eddings* v. *Oklahoma,* 455 U. S. 104 (1982); *id.,* at 117 (O'CONNOR, J., concurring); *Beck* v. *Alabama,* 447 U. S. 625 (1980). We would leave it there, but will not extend it further.

## IV

Petitioner claims that his sentence violates the Eighth Amendment for a reason in addition to its alleged disproportionality. He argues that it is "cruel and unusual" to impose a mandatory sentence of such severity, without any consideration of so-called mitigating factors such as, in his case, the fact that he had no prior felony convictions. He apparently contends that the Eighth Amendment requires Michigan to create a sentencing scheme whereby life in prison without possibility of parole is simply the most severe of a range of available penalties that the sentencer may impose after hearing evidence in mitigation and aggravation.

As our earlier discussion should make clear, this claim has no support in the text and history of the Eighth Amendment. Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in

various forms throughout our Nation's history. As noted earlier, mandatory death sentences abounded in our first Penal Code. They were also common in the several States — both at the time of the founding and throughout the 19th century. See *Woodson* v. *North Carolina*, 428 U. S., at 289–290. There can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is "mandatory." See *Chapman* v. *United States*, 500 U. S. 453, 467 (1991).

Petitioner's "required mitigation" claim, like his proportionality claim, does find support in our death penalty jurisprudence. We have held that a capital sentence is cruel and unusual under the Eighth Amendment if it is imposed without an individualized determination that that punishment is "appropriate"—whether or not the sentence is "grossly disproportionate." See *Woodson* v. *North Carolina, supra; Lockett* v. *Ohio,* 438 U. S. 586 (1978); *Eddings* v. *Oklahoma, supra; Hitchcock* v. *Dugger,* 481 U. S. 393 (1987). Petitioner asks us to extend this so-called "individualized capital-sentencing doctrine," *Sumner* v. *Shuman,* 483 U. S. 66, 73 (1987), to an "individualized mandatory life in prison without parole sentencing doctrine." We refuse to do so.

Our cases creating and clarifying the "individualized capital sentencing doctrine" have repeatedly suggested that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties. See *Eddings* v. *Oklahoma,* 455 U. S., at 110–112; *id.,* at 117–118 (O'CONNOR, J., concurring); *Lockett* v. *Ohio, supra,* at 602–605; *Woodson* v. *North Carolina, supra,* at 303–305; *Rummel* v. *Estelle, supra,* at 272.

> "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept

of humanity." *Furman* v. *Georgia,* 408 U. S., at 306 (Stewart, J., concurring).

It is true that petitioner's sentence is unique in that it is the second most severe known to the law; but life imprisonment *with* possibility of parole is also unique in that it is the third most severe. And if petitioner's sentence forecloses some "flexible techniques" for later reducing his sentence, see *Lockett, supra,* at 605 (Burger, C. J.) (plurality opinion), it does not foreclose all of them, since there remain the possibilities of retroactive legislative reduction and executive clemency. In some cases, moreover, there will be negligible difference between life without parole and other sentences of imprisonment—for example, a life sentence with eligibility for parole after 20 years, or even a lengthy term sentence without eligibility for parole, given to a 65-year-old man. But even where the difference is the greatest, it cannot be compared with death. We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further.

The judgment of the Michigan Court of Appeals is

*Affirmed.*

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR and JUSTICE SOUTER join, concurring in part and concurring in the judgment.

I concur in Part IV of the Court's opinion and in the judgment. I write this separate opinion because my approach to the Eighth Amendment proportionality analysis differs from JUSTICE SCALIA's. Regardless of whether JUSTICE SCALIA or JUSTICE WHITE has the best of the historical argument, compare *ante,* at 966–985, with *post,* at 1009–1011, and n. 1, *stare decisis* counsels our adherence to the narrow proportionality principle that has existed in our Eighth Amendment jurisprudence for 80 years. Although our proportionality decisions have not been clear or consistent in all respects,

they can be reconciled, and they require us to uphold petitioner's sentence.

I

A

Our decisions recognize that the Cruel and Unusual Punishments Clause encompasses a narrow proportionality principle. We first interpreted the Eighth Amendment to prohibit "'greatly disproportioned'" sentences in *Weems* v. *United States*, 217 U. S. 349, 371 (1910), quoting *O'Neil* v. *Vermont*, 144 U. S. 323, 340 (1892) (Field, J., dissenting). Since *Weems*, we have applied the principle in different Eighth Amendment contexts. Its most extensive application has been in death penalty cases. In *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977), we held that "a sentence of death is grossly disproportionate and excessive punishment for the crime of rape and is therefore forbidden by the Eighth Amendment as cruel and unusual punishment." We applied like reasoning in *Enmund* v. *Florida*, 458 U. S. 782 (1982), to strike down a capital sentence imposed for a felony-murder conviction in which the defendant had not committed the actual murder and lacked intent to kill. Cf. *Tison* v. *Arizona*, 481 U. S. 137 (1987).

The Eighth Amendment proportionality principle also applies to noncapital sentences. In *Rummel* v. *Estelle*, 445 U. S. 263 (1980), we acknowledged the existence of the proportionality rule for both capital and noncapital cases, *id.*, at 271–274, and n. 11, but we refused to strike down a sentence of life imprisonment, with possibility of parole, for recidivism based on three underlying felonies. In *Hutto* v. *Davis*, 454 U. S. 370, 374, and n. 3 (1982), we recognized the possibility of proportionality review but held it inapplicable to a 40-year prison sentence for possession with intent to distribute nine ounces of marijuana. Our most recent decision discussing the subject is *Solem* v. *Helm*, 463 U. S. 277 (1983). There we held that a sentence of life imprisonment without possibility of parole violated the Eighth Amendment because it was

"grossly disproportionate" to the crime of recidivism based on seven underlying nonviolent felonies. The dissent in *Solem* disagreed with the Court's application of the proportionality principle but observed that in extreme cases it could apply to invalidate a punishment for a term of years. *Id.*, at 280, n. 3. See also *Hutto* v. *Finney*, 437 U. S. 678, 685 (1978) (dicta); *Ingraham* v. *Wright*, 430 U. S. 651, 667 (1977) (dicta).

B

Though our decisions recognize a proportionality principle, its precise contours are unclear. This is so in part because we have applied the rule in few cases and even then to sentences of different types. Our most recent pronouncement on the subject in *Solem*, furthermore, appeared to apply a different analysis than in *Rummel* and *Davis*. *Solem* twice stated, however, that its decision was consistent with *Rummel* and thus did not overrule it. *Solem, supra*, at 288, n. 13, 303, n. 32. Despite these tensions, close analysis of our decisions yields some common principles that give content to the uses and limits of proportionality review.

The first of these principles is that the fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is "properly within the province of legislatures, not courts." *Rummel, supra*, at 275–276. Determinations about the nature and purposes of punishment for criminal acts implicate difficult and enduring questions respecting the sanctity of the individual, the nature of law, and the relation between law and the social order. "As a moral or political issue [the punishment of offenders] provokes intemperate emotions, deeply conflicting interests, and intractable disagreements." D. Garland, Punishment and Modern Society 1 (1990). The efficacy of any sentencing system cannot be assessed absent agreement on the purposes and objectives of the penal system. And the responsibility for making these fundamental choices and implementing them lies with the legislature. See *Gore* v. *United States*,

357 U. S. 386, 393 (1958) ("Whatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility, . . . these are peculiarly questions of legislative policy"). Thus, "[r]eviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." *Solem, supra,* at 290. See also *Rummel, supra,* at 274 (acknowledging "reluctance to review legislatively mandated terms of imprisonment"); *Weems, supra,* at 379 ("The function of the legislature is primary, its exercises fortified by presumptions of right and legality, and is not to be interfered with lightly, nor by any judicial conception of their wisdom or propriety").

The second principle is that the Eighth Amendment does not mandate adoption of any one penological theory. "The principles which have guided criminal sentencing . . . have varied with the times." *Payne* v. *Tennessee, ante,* at 819. The federal and state criminal systems have accorded different weights at different times to the penological goals of retribution, deterrence, incapacitation, and rehabilitation. Compare *Mistretta* v. *United States,* 488 U. S. 361, 363–366 (1989), with *Williams* v. *New York,* 337 U. S. 241, 248 (1949). And competing theories of mandatory and discretionary sentencing have been in varying degrees of ascendancy or decline since the beginning of the Republic. See *United States* v. *Grayson,* 438 U. S. 41, 45–47 (1978).

Third, marked divergences both in underlying theories of sentencing and in the length of prescribed prison terms are the inevitable, often beneficial, result of the federal structure. See *Solem, supra,* at 291, n. 17 ("The inherent nature of our federal system" may result in "a wide range of constitutional sentences"). "Our federal system recognizes the independent power of a State to articulate societal norms through criminal law." *McCleskey* v. *Zant,* 499 U. S. 467, 491 (1991). State sentencing schemes may embody different penological assumptions, making interstate comparison of

sentences a difficult and imperfect enterprise. See *Rummel*, 445 U. S., at 281. See also *Solem*, 463 U. S., at 294–295 (comparison of different terms of years for imprisonment "troubling" but not "unique to this area"). And even assuming identical philosophies, differing attitudes and perceptions of local conditions may yield different, yet rational, conclusions regarding the appropriate length of prison terms for particular crimes. Thus, the circumstance that a State has the most severe punishment for a particular crime does not by itself render the punishment grossly disproportionate. *Rummel*, 445 U. S., at 281. "[O]ur Constitution 'is made for people of fundamentally differing views.' . . . Absent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State." *Id.*, at 282, quoting *Lochner* v. *New York*, 198 U. S. 45, 76 (1905) (Holmes, J., dissenting). See also *Graham* v. *West Virginia*, 224 U. S. 616 (1912).

The fourth principle at work in our cases is that proportionality review by federal courts should be informed by "'objective factors to the maximum possible extent.'" *Rummel, supra*, at 274–275, quoting *Coker*, 433 U. S., at 592 (plurality opinion). See also *Solem, supra*, at 290. The most prominent objective factor is the type of punishment imposed. In *Weems*, "the Court could differentiate in an objective fashion between the highly unusual *cadena temporal* and more traditional forms of imprisonment imposed under the Anglo-Saxon system." *Rummel*, 445 U. S., at 275. In a similar fashion, because "'[t]he penalty of death differs from all other forms of criminal punishment,'" *id.*, at 272, quoting *Furman* v. *Georgia*, 408 U. S. 238, 306 (1972) (opinion of Stewart, J.), the objective line between capital punishment and imprisonment for a term of years finds frequent mention in our Eighth Amendment jurisprudence. See *Solem, supra*, at 294 ("The easiest comparison [of different sentences] is between capital punishment and noncapital punish-

ment"). By contrast, our decisions recognize that we lack clear objective standards to distinguish between sentences for different terms of years. *Rummel, supra,* at 275. See also *Solem,* 463 U. S., at 294 ("It is clear that a 25-year sentence generally is more severe than a 15-year sentence, but in most cases it would be difficult to decide that the former violates the Eighth Amendment while the latter does not") (footnote omitted). Although "no penalty is *per se* constitutional," *id.,* at 290, the relative lack of objective standards concerning terms of imprisonment has meant that "'[o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [are] exceedingly rare.'" *Id.,* at 289–290, quoting *Rummel, supra,* at 272.

All of these principles — the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors — inform the final one: The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime. *Solem, supra,* at 288, 303. See also *Weems,* 217 U. S., at 371 (Eighth Amendment prohibits "greatly disproportioned" sentences); *Coker, supra,* at 592 (Eighth Amendment prohibits "grossly disproportionate" sentences); *Rummel, supra,* at 271 (same).

## II

With these considerations stated, it is necessary to examine the challenged aspects of petitioner's sentence: its severe length and its mandatory operation.

### A

Petitioner's life sentence without parole is the second most severe penalty permitted by law. It is the same sentence received by the petitioner in *Solem.* Petitioner's crime, however, was far more grave than the crime at issue in *Solem.*

The crime of uttering a no account check at issue in *Solem* was "'one of the most passive felonies a person could commit.'" *Solem*, 463 U. S., at 296 (citation omitted). It "involved neither violence nor threat of violence to any person," and was "viewed by society as among the less serious offenses." *Ibid.* The felonies underlying the defendant's recidivism conviction, moreover, were "all relatively minor." *Id.*, at 296–297. The *Solem* Court contrasted these "minor" offenses with "very serious offenses" such as "a third offense of heroin dealing," and stated that "[n]o one suggests that [a statute providing for life imprisonment without parole] may not be applied constitutionally to fourth-time heroin dealers or other violent criminals." *Id.*, at 299, and n. 26.

Petitioner was convicted of possession of more than 650 grams (over 1.5 pounds) of cocaine. This amount of pure cocaine has a potential yield of between 32,500 and 65,000 doses. A. Washton, Cocaine Addiction: Treatment, Recovery, and Relapse Prevention 18 (1989). From any standpoint, this crime falls in a different category from the relatively minor, nonviolent crime at issue in *Solem*. Possession, use, and distribution of illegal drugs represent "one of the greatest problems affecting the health and welfare of our population." *Treasury Employees* v. *Von Raab*, 489 U. S. 656, 668 (1989). Petitioner's suggestion that his crime was nonviolent and victimless, echoed by the dissent, see *post*, at 1022–1023, is false to the point of absurdity. To the contrary, petitioner's crime threatened to cause grave harm to society.

Quite apart from the pernicious effects on the individual who consumes illegal drugs, such drugs relate to crime in at least three ways: (1) A drug user may commit crime because of drug-induced changes in physiological functions, cognitive ability, and mood; (2) A drug user may commit crime in order to obtain money to buy drugs; and (3) A violent crime may occur as part of the drug business or culture. See Goldstein, Drugs and Violent Crime, in Pathways to Criminal Violence

16, 24–36 (N. Weiner & M. Wolfgang eds. 1989). Studies bear out these possibilities and demonstrate a direct nexus between illegal drugs and crimes of violence. See generally *id.*, at 16–48. To mention but a few examples, 57 percent of a national sample of males arrested in 1989 for homicide tested positive for illegal drugs. National Institute of Justice, 1989 Drug Use Forecasting Annual Report 9 (June 1990). The comparable statistics for assault, robbery, and weapons arrests were 55, 73, and 63 percent, respectively. *Ibid.* In Detroit, Michigan, in 1988, 68 percent of a sample of male arrestees and 81 percent of a sample of female arrestees tested positive for illegal drugs. National Institute of Justice, 1988 Drug Use Forecasting Annual Report 4 (Mar. 1990). Fifty-one percent of males and seventy-one percent of females tested positive for cocaine. *Id.*, at 7. And last year an estimated 60 percent of the homicides in Detroit were drug related, primarily cocaine related. U. S. Department of Health and Human Services, Epidemiologic Trends in Drug Abuse 107 (Dec. 1990).

These and other facts and reports detailing the pernicious effects of the drug epidemic in this country do not establish that Michigan's penalty scheme is correct or the most just in any abstract sense. But they do demonstrate that the Michigan Legislature could with reason conclude that the threat posed to the individual and society by possession of this large an amount of cocaine—in terms of violence, crime, and social displacement—is momentous enough to warrant the deterrence and retribution of a life sentence without parole. See *United States* v. *Mendenhall*, 446 U. S. 544, 561 (1980) (Powell, J., concurring in part and concurring in judgment) ("Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances"); *Florida* v. *Royer*, 460 U. S. 491, 513 (1983) (BLACKMUN, J., dissenting) (same). See also *Terrebonne* v. *Butler*, 848 F. 2d 500, 504 (CA5 1988) (en banc).

The severity of petitioner's crime brings his sentence within the constitutional boundaries established by our prior decisions. In *Hutto* v. *Davis*, 454 U. S. 370 (1982), we upheld against proportionality attack a sentence of 40 years' imprisonment for possession with intent to distribute nine ounces of marijuana. Here, Michigan could with good reason conclude that petitioner's crime is more serious than the crime in *Davis*. Similarly, a rational basis exists for Michigan to conclude that petitioner's crime is as serious and violent as the crime of felony murder without specific intent to kill, a crime for which "no sentence of imprisonment would be disproportionate," *Solem*, 463 U. S., at 290, n. 15. Cf. *Rummel*, 445 U. S., at 296, n. 12 (Powell, J., dissenting) ("A professional seller of addictive drugs may inflict greater bodily harm upon members of society than the person who commits a single assault").

Petitioner and *amici* contend that our proportionality decisions require a comparative analysis between petitioner's sentence and sentences imposed for other crimes in Michigan and sentences imposed for the same crime in other jurisdictions. Given the serious nature of petitioner's crime, no such comparative analysis is necessary. Although *Solem* considered these comparative factors after analyzing "the gravity of the offense and the harshness of the penalty," 463 U. S., at 290–291, it did not announce a rigid three-part test. In fact, *Solem* stated that in determining unconstitutional disproportionality, "no one factor will be dispositive in a given case." *Id.*, at 291, n. 17. See also *ibid.* ("[N]o single criterion can identify when a sentence is so grossly disproportionate that it violates the Eighth Amendment").

On the other hand, one factor may be sufficient to determine the constitutionality of a particular sentence. Consistent with its admonition that "a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate," *id.*, at 290, n. 16, *Solem* is best understood as holding that comparative

analysis within and between jurisdictions is not always relevant to proportionality review. The Court stated that "it *may* be helpful to compare sentences imposed on other criminals in the same jurisdiction," and that "courts *may* find it useful to compare the sentences imposed for commission of the same crime in other jurisdictions." *Id.*, at 291–292 (emphasis added). It did not mandate such inquiries.

A better reading of our cases leads to the conclusion that intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality. In *Solem* and *Weems*, decisions in which the Court invalidated sentences as disproportionate, we performed a comparative analysis of sentences after determining that the sentence imposed was grossly excessive punishment for the crime committed. *Solem, supra,* at 298–300; *Weems,* 217 U. S., at 377–381. By contrast, *Rummel* and *Davis,* decisions in which the Court upheld sentences against proportionality attacks, did not credit such comparative analyses. In rejecting this form of argument, *Rummel* noted that "[e]ven were we to assume that the statute employed against Rummel was the most stringent found in the 50 States, that severity hardly would render Rummel's punishment 'grossly disproportionate' to his offenses." *Rummel, supra,* at 281.

The proper role for comparative analysis of sentences, then, is to validate an initial judgment that a sentence is grossly disproportionate to a crime. This conclusion neither "eviscerate[s]" *Solem,* nor "abandon[s]" its second and third factors, as the dissent charges, *post,* at 1018, 1020, and it takes full account of *Rummel* and *Davis,* cases ignored by the dissent. In light of the gravity of petitioner's offense, a comparison of his crime with his sentence does not give rise to an inference of gross disproportionality, and comparative analysis of his sentence with others in Michigan and across the Nation need not be performed.

## B

Petitioner also attacks his sentence because of its mandatory nature. Petitioner would have us hold that any severe penalty scheme requires individualized sentencing so that a judicial official may consider mitigating circumstances. Our precedents do not support this proposition, and petitioner presents no convincing reason to fashion an exception or adopt a new rule in the case before us. The Court demonstrates that our Eighth Amendment capital decisions reject any requirement of individualized sentencing in noncapital cases. *Ante*, at 994–996.

The mandatory nature of this sentence comports with our noncapital proportionality decisions as well. The statute at issue in *Solem* made the offender liable to a maximum, not a mandatory, sentence of life imprisonment without parole. *Solem*, 463 U. S., at 281–282, n. 6. Because a "lesser sentence . . . could have been entirely consistent with both the statute and the Eighth Amendment," the Court's decision "d[id] not question the legislature's judgment," but rather challenged the sentencing court's selection of a penalty at the top of the authorized sentencing range. *Id.*, at 299, n. 26. Here, by contrast, the Michigan Legislature has mandated the penalty and has given the state judge no discretion in implementing it. It is beyond question that the legislature "has the power to define criminal punishments without giving the courts any sentencing discretion," *Chapman* v. *United States*, 500 U. S. 453, 467 (1991). Since the beginning of the Republic, Congress and the States have enacted mandatory sentencing schemes. See *Mistretta* v. *United States*, 488 U. S., at 363; *United States* v. *Grayson*, 438 U. S., at 45–46; *Ex parte United States*, 242 U. S. 27 (1916). To set aside petitioner's mandatory sentence would require rejection not of the judgment of a single jurist, as in *Solem*, but rather the collective wisdom of the Michigan Legislature and, as a consequence, the Michigan citizenry. We have never invalidated a penalty mandated by a legislature based only on the

length of sentence, and, especially with a crime as severe as this one, we should do so only in the most extreme circumstance. Cf. *Rummel*, 445 U. S., at 274.

In asserting the constitutionality of this mandatory sentence, I offer no judgment on its wisdom. Mandatory sentencing schemes can be criticized for depriving judges of the power to exercise individual discretion when remorse and acknowledgment of guilt, or other extenuating facts, present what might seem a compelling case for departure from the maximum. On the other hand, broad and unreviewed discretion exercised by sentencing judges leads to the perception that no clear standards are being applied, and that the rule of law is imperiled by sentences imposed for no discernible reason other than the subjective reactions of the sentencing judge. The debate illustrates that, as noted at the outset, arguments for and against particular sentencing schemes are for legislatures to resolve.

Michigan's sentencing scheme establishes graduated punishment for offenses involving varying amounts of mixtures containing controlled substances. Possession of controlled substances in schedule 1 or 2 in an amount less than 50 grams results in a sentence of up to 20 years' imprisonment; possession of more than 50 but less than 225 grams results in a mandatory minimum prison sentence of 10 years with a maximum sentence of 20 years; possession of more than 225 but less than 650 grams results in a mandatory minimum prison sentence of 20 years with a maximum sentence of 30 years; and possession of 650 grams or more results in a mandatory life sentence. Mich. Comp. Laws Ann. § 333.7401 (West Supp. 1990–1991). Sentencing courts may depart from the minimum terms specified for all amounts, except those exceeding 650 grams, "if the court finds on the record that there are substantial and compelling reasons to do so." §§ 333.7401(4), 333.7403(3). This system is not an ancient one revived in a sudden or surprising way; it is, rather, a recent enactment calibrated with care, clarity, and much deliberation to ad-

dress a most serious contemporary social problem. The scheme provides clear notice of the severe consequences that attach to possession of drugs in wholesale amounts, thereby giving force to one of the first purposes of criminal law—deterrence. In this sense, the Michigan scheme may be as fair, if not more so, than other sentencing systems in which the sentencer's discretion or the complexity of the scheme obscures the possible sanction for a crime, resulting in a shock to the offender who learns the severity of his sentence only after he commits the crime.

The Michigan scheme does possess mechanisms for consideration of individual circumstances. Prosecutorial discretion before sentence and executive or legislative clemency afterwards provide means for the State to avert or correct unjust sentences. Here the prosecutor may have chosen to seek the maximum penalty because petitioner possessed 672.5 grams of undiluted cocaine and several other trappings of a drug trafficker, including marijuana cigarettes, four brass cocaine straws, a cocaine spoon, 12 Percodan tablets, 25 tablets of Phendimetrazine Tartrate, a Motorola beeper, plastic bags containing cocaine, a coded address book, and $3,500 in cash.

## III

A penalty as severe and unforgiving as the one imposed here would make this a most difficult and troubling case for any judicial officer. Reasonable minds may differ about the efficacy of Michigan's sentencing scheme, and it is far from certain that Michigan's bold experiment will succeed. The accounts of pickpockets at Tyburn hangings are a reminder of the limits of the law's deterrent force, but we cannot say the law before us has no chance of success and is on that account so disproportionate as to be cruel and unusual punishment. The dangers flowing from drug offenses and the circumstances of the crime committed here demonstrate that the Michigan penalty scheme does not surpass constitutional

bounds. Michigan may use its criminal law to address the issue of drug possession in wholesale amounts in the manner that it has in this sentencing scheme. See *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting). For the foregoing reasons, I conclude that petitioner's sentence of life imprisonment without parole for his crime of possession of more than 650 grams of cocaine does not violate the Eighth Amendment.

JUSTICE WHITE, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, dissenting.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." JUSTICE SCALIA concludes that "the Eighth Amendment contains no proportionality guarantee." *Ante,* at 965. Accordingly, he says *Solem* v. *Helm,* 463 U. S. 277 (1983), "was simply wrong" in holding otherwise, as would be the Court's other cases interpreting the Amendment to contain a proportionality principle. JUSTICE KENNEDY, on the other hand, asserts that the Eighth Amendment's proportionality principle is so "narrow," *ante,* at 996, that *Solem*'s analysis should be reduced from three factors to one. With all due respect, I dissent.

The language of the Amendment does not refer to proportionality in so many words, but it does forbid "excessive" fines, a restraint that suggests that a determination of excessiveness should be based at least in part on whether the fine imposed is disproportionate to the crime committed. Nor would it be unreasonable to conclude that it would be both cruel and unusual to punish overtime parking by life imprisonment, see *Rummel* v. *Estelle,* 445 U. S. 263, 274, n. 11 (1980), or, more generally, to impose any punishment that is grossly disproportionate to the offense for which the defendant has been convicted. Thus, Benjamin Oliver, cited by

JUSTICE SCALIA, *ante*, at 981, observed with respect to the Eighth Amendment:

"No express restriction is laid in the constitution, upon the power of imprisoning for crimes. But, as it is forbidden to demand unreasonable bail, which merely exposes the individual concerned, to imprisonment in case he cannot procure it; as it is forbidden to impose unreasonable fines, on account of the difficulty the person fined would have of paying them, the default of which would be punished by imprisonment only, it would seem, that imprisonment for an unreasonable length of time, is also contrary to the spirit of the constitution. Thus in cases where the courts have a discretionary power to fine and imprison, shall it be supposed, that the power to fine is restrained, but the power to imprison is wholly unrestricted by it? In the absence of all express regulations on the subject, it would surely be absurd to imprison an individual for a term of years, for some inconsiderable offence, and consequently it would seem, that a law imposing so severe a punishment must be contrary to the intention of the framers of the constitution." B. Oliver, The Rights of an American Citizen 185–186 (1832).

JUSTICE SCALIA concedes that the language of the Amendment bears such a construction. See *ante*, at 976. His reasons for claiming that it should not be so construed are weak. First, he asserts that if proportionality was an aspect of the restraint, it could have been said more clearly—as plain-talking Americans would have expressed themselves (as for instance, I suppose, in the Fifth Amendment's Due Process Clause or the Fourth Amendment's prohibition against unreasonable searches and seizures).

Second, JUSTICE SCALIA claims that it would be difficult or impossible to label as "unusual" any punishment imposed by the Federal Government, which had just come into existence and had no track record with respect to criminal law. But

the people of the new Nation had been living under the criminal law regimes of the States, and there would have been no lack of benchmarks for determining unusualness. Furthermore, this argument would deprive this part of the Amendment of any meaning at all.

Third, JUSTICE SCALIA argues that all of the available evidence of the day indicated that those who drafted and approved the Amendment "chose . . . not to include within it the guarantee against disproportionate sentences that some State Constitutions contained." *Ante*, at 985. Even if one were to accept the argument that the First Congress did not have in mind the proportionality issue, the evidence would hardly be strong enough to come close to proving an affirmative decision against the proportionality component. Had there been an intention to exclude it from the reach of the words that otherwise could reasonably be construed to include it, perhaps as plain-speaking Americans, the Members of the First Congress would have said so. And who can say with confidence what the members of the state ratifying conventions had in mind when they voted in favor of the Amendment? Surely, subsequent state-court decisions do not answer that question.[1]

---

[1] As JUSTICE SCALIA notes, *ante*, at 966, the text of the Eighth Amendment is taken almost verbatim from the English Declaration of Rights of 1689. He argues that if the Amendment was intended to adopt whatever meaning the declaration was understood in England to have, the Amendment does not contain a proportionality component because the declaration did not include the proportionality principle. JUSTICE SCALIA labors to demonstrate as much, but concedes that there are scholars who disagree and have the view that the declaration forbade both illegal and disproportionate punishments. *Ante*, at 974–975. One such scholar, after covering much the same ground as does JUSTICE SCALIA, concluded that "[t]he English evidence shows that the cruel and unusual punishments clause of the Bill of Rights of 1689 was first, an objection to the imposition of punishments which were unauthorized by statute and outside the jurisdiction of the sentencing court, and second, a reiteration of the English policy against disproportionate penalties." Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839, 860

In any event, the Amendment as ratified contained the words "cruel and unusual," and there can be no doubt that prior decisions of this Court have construed these words to include a proportionality principle. In 1910, in the course of holding unconstitutional a sentence imposed by the Philippine courts, the Court stated:

"Such penalties for such offenses amaze those who . . . believe that it is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense. *Weems* v. *United States*, 217 U. S. 349, 366–367 (1910).

"[T]he inhibition [of the Cruel and Unusual Punishments Clause] was directed, not only against punishments which inflict torture, 'but against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged.'" *Id.*, at 371, quoting *O'Neil* v. *Vermont*, 144 U. S. 323, 339–340 (1892) (Field, J., dissenting).

That the punishment imposed in *Weems* was also unknown to Anglo-American tradition—"It has no fellow in American legislation," 217 U. S., at 377—was just another reason to set aside the sentence and did not in the least detract from the holding with respect to proportionality, which, as *Gregg* v. *Georgia*, 428 U. S. 153, 171–172 (1976), observed, was the focus of the Court's holding.

*Robinson* v. *California*, 370 U. S. 660 (1962), held for the first time that the Eighth Amendment was applicable to punishment imposed by state courts; it also held it to be cruel and unusual to impose even one day of imprisonment for the status of drug addiction, *id.*, at 667. The principal opinion in *Gregg*, *supra*, at 173, observed that the Eighth Amendment's proscription of cruel and unusual punishment is an evolving

---

(1969). JUSTICE SCALIA goes on to argue that whatever the declaration meant to Englishmen, the almost identical language of the Eighth Amendment should not be interpreted to forbid excessive punishments. As indicated in the text, I disagree.

concept and announced that punishment would violate the Amendment if it "involve[d] the unnecessary and wanton infliction of pain" or if it was "grossly out of proportion to the severity of the crime." Under this test, the death penalty was not cruel and unusual in all cases. Following *Gregg*, *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977), held that the Amendment bars not only a barbaric punishment but also a punishment that is excessive, *i. e.*, a punishment that "(1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime." We went on to hold that the punishment of death for the crime of rape was unconstitutional for lack of proportionality. *Ibid.* Similarly, in *Enmund* v. *Florida*, 458 U. S. 782 (1982), we invalidated a death sentence for felony murder, on disproportionality grounds, where there had been no proof of an intent to murder. Finally, *Solem* v. *Helm*, 463 U. S. 277 (1983), invalidated a prison sentence on the ground that it was too severe in relation to the crime that had been committed.

Not only is it undeniable that our cases have construed the Eighth Amendment to embody a proportionality component, but it is also evident that none of the Court's cases suggest that such a construction is impermissible. Indeed, *Rummel* v. *Estelle*, 445 U. S. 263 (1980), the holding of which JUSTICE SCALIA does not question, itself recognized that the Eighth Amendment contains a proportionality requirement, for it did not question *Coker* and indicated that the proportionality principle would come into play in some extreme, nonfelony cases. *Id.*, at 272, 274, and n. 11.

If JUSTICE SCALIA really means what he says — "the Eighth Amendment contains no proportionality guarantee," *ante*, at 965, it is difficult to see how any of the above holdings and declarations about the proportionality requirement of the Amendment could survive. Later in his opinion, however, *ante*, at 994, JUSTICE SCALIA backtracks and appears to ac-

cept that the Amendment does indeed insist on proportional punishments in a particular class of cases, those that involve sentences of death. His fallback position is that outside the capital cases, proportionality review is not required by the Amendment. With the exception of capital cases, the severity of the sentence for any crime is a matter that the Amendment leaves to the discretion of legislators. Any prison sentence, however severe, for any crime, however petty, will be beyond review under the Eighth Amendment. This position restricts the reach of the Eighth Amendment far more than did *Rummel*. It also ignores the generality of the Court's several pronouncements about the Eighth Amendment's proportionality component. And it fails to explain why the words "cruel and unusual" include a proportionality requirement in some cases but not in others. Surely, it is no explanation to say only that such a requirement in death penalty cases is part of our capital punishment jurisprudence. That is true, but the decisions requiring proportionality do so because of the Eighth Amendment's prohibition against cruel and unusual punishments. The Court's capital punishment cases requiring proportionality reject JUSTICE SCALIA's notion that the Amendment bars only cruel and unusual modes or methods of punishment. Under that view, capital punishment—a mode of punishment—would either be completely barred or left to the discretion of the legislature. Yet neither is true. The death penalty is appropriate in some cases and not in others. The same should be true of punishment by imprisonment.

What is more, the Court's jurisprudence concerning the scope of the prohibition against cruel and unusual punishments has long understood the limitations of a purely historical analysis. See *Trop* v. *Dulles*, 356 U. S. 86, 100–101 (1958) (plurality opinion); *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 264, n. 4 (1989). Thus, "this Court has 'not confined the prohibition embodied in the Eighth Amendment to "barbarous" methods that were

generally outlawed in the 18th century,' but instead has interpreted the Amendment 'in a flexible and dynamic manner.'" *Stanford* v. *Kentucky*, 492 U. S. 361, 369 (1989), quoting *Gregg* v. *Georgia*, 428 U. S., at 171 (opinion of Stewart, Powell, and STEVENS, JJ.). In so doing, the Court has borne in mind Justice McKenna's admonition in *Weems* v. *United States*, 217 U. S., at 373, that "[t]ime works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions." See also *Browning-Ferris, supra,* at 273 (quoting *Weems*).

The Court therefore has recognized that a punishment may violate the Eighth Amendment if it is contrary to the "evolving standards of decency that mark the progress of a maturing society." *Trop, supra,* at 101. See *Stanford, supra,* at 369 (quoting *Trop*). In evaluating a punishment under this test, "we have looked not to our own conceptions of decency, but to those of modern American society as a whole" in determining what standards have "evolved," *Stanford, supra,* at 369, and thus have focused not on "the subjective views of individual Justices," but on "objective factors to the maximum possible extent," *Coker, supra,* at 592 (plurality opinion). It is this type of objective factor which forms the basis for the tripartite proportionality analysis set forth in *Solem.*

Contrary to JUSTICE SCALIA's suggestion, *ante,* at 985–986, the *Solem* analysis has worked well in practice. Courts appear to have had little difficulty applying the analysis to a given sentence, and application of the test by numerous state and federal appellate courts has resulted in a mere handful of sentences being declared unconstitutional.[2] Thus, it is clear

---

[2] Indeed, the parties have cited only four cases decided in the years since *Solem* in which sentences have been reversed on the basis of a proportionality analysis. See *Clowers* v. *State*, 522 So. 2d 762 (Miss. 1988) (holding that trial court had discretion to reduce a mandatory sentence of 15 years without parole under a recidivist statute for a defendant who ut-

that reviewing courts have not baldly substituted their own subjective moral values for those of the legislature. Instead, courts have demonstrated that they are "capable of applying the Eighth Amendment to disproportionate noncapital sentences with a high degree of sensitivity to principles of federalism and state autonomy."[3] *Rummel*, 445 U. S., at 306 (Powell, J., dissenting). *Solem* is wholly consistent with this approach, and when properly applied, its analysis affords "substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals," 463 U. S., at 290 (footnote omitted), and will only rarely result in a sentence failing constitutional muster. The fact that this is one of those rare instances is no reason to abandon the analysis.

Nor does the fact that this case involves judicial review of a legislatively mandated sentence, rather than a sentence imposed in the exercise of judicial discretion, warrant abandonment of *Solem*. First, the quote from *Solem* in the preceding paragraph makes clear that the analysis is intended to apply to both types of sentences. Second, contrary to JUSTICE SCALIA's suggestion, *ante*, at 976, the fact that a punish-

---

tered a forged check); *Ashley* v. *State*, 538 So. 2d 1181 (Miss. 1989) (reaching a similar result for a defendant who burgled a home to get $4 to pay a grocer for food eaten in the store); *State* v. *Gilham*, 48 Ohio App. 3d 293, 549 N. E. 2d 555 (1988). In addition, in *Naovarath* v. *State*, 105 Nev. 525, 779 P. 2d 944 (1989), the court relied on both State and Federal Constitutions to strike a sentence of life without parole imposed on an adolescent who killed and then robbed an individual who had repeatedly molested him.

[3] Nor are appellate courts forced to expend undue resources to evaluate prison sentences under *Solem*. In each case cited by respondent in which an appellate court had to review a sentence under *Solem*, the court quickly disposed of the constitutional challenge. See *United States* v. *Sullivan*, 895 F. 2d 1030, 1031–1032 (CA5), cert. denied, 498 U. S. 877 (1990); *United States* v. *Benefield*, 889 F. 2d 1061, 1063–1065 (CA11 1989); *United States* v. *Savage*, 888 F. 2d 528 (CA7 1989), cert. denied, 495 U. S. 959 (1990); *State* v. *Elbert*, 125 N. H. 1, 15–16, 480 A. 2d 854, 862 (1984) (Souter, J.).

ment has been legislatively mandated does not automatically render it "legal" or "usual" in the constitutional sense. Indeed, as noted above, if this were the case, then the prohibition against cruel and unusual punishments would be devoid of any meaning. He asserts that when "[w]renched out of its common-law context, and applied to the actions of a legislature, the word 'unusual' could hardly mean 'contrary to law,'" because "[t]here were no common-law punishments in the federal system." *Ante*, at 975, 976. But if this is so, then neither could the term "unusual" mean "contrary to custom," for until Congress passed the first penal law, there were no "customary" federal punishments either. Moreover, the suggestion that a legislatively mandated punishment is necessarily "legal" is the antithesis of the principles established in *Marbury* v. *Madison*, 1 Cranch 137 (1803), for "[i]t is emphatically the province and duty of the judicial department to say what the law is," *id.*, at 177, and to determine whether a legislative enactment is consistent with the Constitution. This Court's decision in *Robinson* v. *California*, 370 U. S. 660 (1962), in which the prohibition against cruel and unusual punishments was made applicable to the States through the Fourteenth Amendment, removed any doubt that it is as much our duty to assess the constitutionality of punishments enacted by state legislative bodies as it is our obligation to review congressional enactments. Indeed, the Court's prior decisions have recognized that legislatively mandated sentences may violate the Eighth Amendment. See *Rummel*, *supra*, at 274, n. 11; *Hutto* v. *Davis*, 454 U. S. 370, 374, n. 3 (1982). This Court has long scrutinized legislative enactments concerning punishment without fear that it was unduly invading the legislative prerogative of the States. See, *e. g.*, *Coker* v. *Georgia*, 433 U. S. 584 (1977); *Enmund* v. *Florida*, 458 U. S. 782 (1982). That such scrutiny requires sensitivity to federalism concerns and involves analysis that may at times be difficult affords no justification for this

Court's abrogation of its responsibility to uphold constitutional principles.

Two dangers lurk in JUSTICE SCALIA's analysis. First, he provides no mechanism for addressing a situation such as that proposed in *Rummel*, in which a legislature makes overtime parking a felony punishable by life imprisonment. He concedes that "one can imagine extreme examples"—perhaps such as the one described in *Rummel*—"that no rational person, in no time or place, could accept," but attempts to offer reassurance by claiming that "for the same reason these examples are easy to decide, they are certain never to occur." *Ante*, at 985–986. This is cold comfort indeed, for absent a proportionality guarantee, there would be no basis for deciding such cases should they arise.

Second, as I have indicated, JUSTICE SCALIA's position that the Eighth Amendment addresses only modes or methods of punishment is quite inconsistent with our capital punishment cases, which do not outlaw death as a mode or method of punishment, but instead put limits on its application. If the concept of proportionality is downgraded in the Eighth Amendment calculus, much of this Court's capital penalty jurisprudence will rest on quicksand.

While JUSTICE SCALIA seeks to deliver a swift death sentence to *Solem*, JUSTICE KENNEDY prefers to eviscerate it, leaving only an empty shell. The analysis JUSTICE KENNEDY proffers is contradicted by the language of *Solem* itself and by our other cases interpreting the Eighth Amendment.

In *Solem*, the Court identified three major factors to consider in assessing whether a punishment violates the Eighth Amendment: "the gravity of the offense and the harshness of the penalty," 463 U. S., at 290–291; "the sentences imposed on other criminals in the same jurisdiction," *id.*, at 291; and "the sentences imposed for commission of the same crime in other jurisdictions," *id.*, at 291–292. JUSTICE KENNEDY, however, maintains that "one factor may be sufficient to determine the constitutionality of a particular sentence," and

that there is no need to consider the second and third factors unless "a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Ante*, at 1004, 1005. *Solem* is directly to the contrary, for there the Court made clear that "no one factor will be dispositive in a given case," and "no single criterion can identify when a sentence is so grossly disproportionate that it violates the Eighth Amendment," "[b]ut a combination of objective factors can make such analysis possible." 463 U. S., at 291, n. 17.

Moreover, as JUSTICE KENNEDY concedes, see *ante*, at 1005, the use of an intrajurisdictional and interjurisdictional comparison of punishments and crimes has long been an integral part of our Eighth Amendment jurisprudence. Numerous cases have recognized that a proper proportionality analysis must include the consideration of such objective factors as "the historical development of the punishment at issue, legislative judgments, international opinion, and the sentencing decisions juries have made." *Enmund, supra*, at 788. See also *Stanford*, 492 U. S., at 369–371; *McCleskey* v. *Kemp*, 481 U. S. 279, 300 (1987).

Thus, in *Weems*, 217 U. S., at 380–381, the Court noted the great disparity between the crime at issue and those within the same jurisdiction for which less severe punishments were imposed. In *Trop*, 356 U. S., at 102–103, the Court surveyed international law before determining that forfeiture of citizenship as a punishment for wartime desertion violated the Eighth Amendment. In *Coker* v. *Georgia, supra*, we sought "guidance in history and from the objective evidence of the country's present judgment concerning the acceptability of death as a penalty for rape of an adult woman," *id.*, at 593 (plurality opinion), and surveyed the laws of the States before concluding that "[t]he current judgment with respect to the death penalty for rape," though "not wholly unanimous among state legislatures, . . . weigh[ed] very heavily on the side of rejecting capital punishment as a

suitable penalty," *id.*, at 596 (plurality opinion). And in *Enmund,* we again reviewed the laws of the States before concluding that the death penalty is unconstitutional when inflicted upon one who merely participates in a felony during which a murder occurs. 458 U. S., at 797. That in some of these cases the comparisons were made after the Court had considered the severity of the crime in no way suggests that this part of the analysis was any less essential·to an assessment of a given punishment's proportionality.

JUSTICE KENNEDY's abandonment of the second and third factors set forth in *Solem* makes any attempt at an objective proportionality analysis futile. The first prong of *Solem* requires a court to consider two discrete factors—the gravity of the offense and the severity of the punishment. A court is not expected to consider the interaction of these two elements and determine whether "the sentence imposed was grossly excessive punishment for the crime committed." See *ante,* at 1005. Were a court to attempt such an assessment, it would have no basis for its determination that a sentence was—or was not—disproportionate, other than the "subjective views of individual [judges]," *Coker, supra,* at 592 (plurality opinion), which is the very sort of analysis our Eighth Amendment jurisprudence has shunned. JUSTICE KENNEDY asserts that "our decisions recognize that we lack clear objective standards to distinguish between sentences for different terms of years," citing *Rummel* and *Solem* as support. *Ante,* at 1001. But *Solem* recognized that

> "[f]or sentences of imprisonment, the problem is not so much one of ordering, but one of line-drawing. It is clear that a 25-year sentence generally is more severe than a 15-year sentence, but in most cases it would be difficult to decide that the former violates the Eighth Amendment while the latter does not. Decisions of this kind, although troubling, are not unique to this area. The courts are constantly called upon to draw similar

lines in a variety of contexts." 463 U. S., at 294 (footnote omitted).

The Court compared line-drawing in the Eighth Amendment context to that regarding the Sixth Amendment right to a speedy trial and right to a jury before concluding that "courts properly may look to the practices in other jurisdictions in deciding where lines between sentences should be drawn." *Id.*, at 295. Indeed, only when a comparison is made with penalties for other crimes and in other jurisdictions can a court begin to make an objective assessment about a given sentence's constitutional proportionality, giving due deference to "public attitudes concerning a particular sentence." *Coker*, 433 U. S., at 592 (plurality opinion).

Because there is no justification for overruling or limiting *Solem*, it remains to apply that case's proportionality analysis to the sentence imposed on petitioner. Application of the *Solem* factors to the statutorily mandated punishment at issue here reveals that the punishment fails muster under *Solem* and, consequently, under the Eighth Amendment to the Constitution.

Petitioner, a first-time offender, was convicted of possession of 672 grams of cocaine. The statute under which he was convicted, Mich. Comp. Laws Ann. § 333.7403(2)(a)(i) (West Supp. 1990–1991), provides that a person who knowingly or intentionally possesses any of various narcotics, including cocaine, "[w]hich is in an amount of 650 grams or more of any mixture containing that controlled substance is guilty of a felony and shall be imprisoned for life." No particular degree of drug purity is required for a conviction. Other statutes make clear that an individual convicted of possessing this quantity of drugs is not eligible for parole. See §§ 791.233b [1](b), 791.234(4). A related statute, § 333.7401(2)(a)(i), which was enacted at the same time as the statute under which petitioner was convicted, mandates the same penalty of life imprisonment without possibility of parole for someone who "manufacture[s], deliver[s], or possess[es] with intent

to manufacture or deliver" 650 grams or more of a narcotic mixture.[4] There is no room for judicial discretion in the imposition of the life sentence upon conviction. The asserted purpose of the legislative enactment of these statutes was to "'stem drug traffic'" and reach "'drug dealers.'" See Brief for Respondent 7, quoting House Legislative Analysis of Mich. House Bill 4190 of 1977 (May 17, 1978).

The first *Solem* factor requires a reviewing court to assess the gravity of the offense and the harshness of the penalty. 463 U. S., at 292. The mandatory sentence of life imprisonment without possibility of parole "is the most severe punishment that the State could have imposed on any criminal for any crime," *id.*, at 297, for Michigan has no death penalty.

Although these factors are "by no means exhaustive," *id.*, at 294, in evaluating the gravity of the offense, it is appropriate to consider "the harm caused or threatened to the victim or society," based on such things as the degree of violence involved in the crime and "[t]he absolute magnitude of the crime," and "the culpability of the offender," including the degree of requisite intent and the offender's motive in committing the crime, *id.*, at 292–293.

Drugs are without doubt a serious societal problem. To justify such a harsh mandatory penalty as that imposed here, however, the offense should be one which will *always* warrant that punishment. Mere possession of drugs—even in such a large quantity—is not so serious an offense that it will always warrant, much less mandate, life imprisonment without possibility of parole. Unlike crimes directed against the persons and property of others, possession of drugs affects the criminal who uses the drugs most directly. The ripple effect on society caused by possession of drugs, through related crimes, lost productivity, health problems, and the like,

---

[4] The two statutes also set forth penalties for those convicted based on lesser quantities of drugs. They provide for parallel penalties for all amounts greater than 50 grams, but below that point the penalties under the two statutes diverge.

is often not the direct consequence of possession, but of the resulting addiction, something which this Court held in *Robinson* v. *California*, 370 U. S., at 660–667, cannot be made a crime.

To be constitutionally proportionate, punishment must be tailored to a defendant's personal responsibility and moral guilt. See *Enmund* v. *Florida*, 458 U. S., at 801. JUSTICE KENNEDY attempts to justify the harsh mandatory sentence imposed on petitioner by focusing on the subsidiary effects of drug use, and thereby ignores this aspect of our Eighth Amendment jurisprudence. While the collateral consequences of drugs such as cocaine are indisputably severe, they are not unlike those which flow from the misuse of other, legal substances. For example, in considering the effects of alcohol on society, the Court has stressed that "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it," *Michigan Dept. of State Police* v. *Sitz*, 496 U. S. 444, 451 (1990), but at the same time has recognized that the severity of the problem "cannot excuse the need for scrupulous adherence to our constitutional principles," *Grady* v. *Corbin*, 495 U. S. 508, 524 (1990). Thus, the Court has held that a drunken driver who has been prosecuted for traffic offenses arising from an accident cannot, consistent with the Double Jeopardy Clause, subsequently be prosecuted for the death of the accident victim. *Ibid.* Likewise, the Court scrutinized closely a state program of vehicle checkpoints designed to detect drunken drivers before holding that the brief intrusion upon motorists is consistent with the Fourth Amendment. *Sitz, supra*, at 451. It is one thing to uphold a checkpoint designed to detect drivers then under the influence of a drug that creates a present risk that they will harm others. It is quite something else to uphold petitioner's sentence because of the collateral consequences which might issue, however indirectly, from the drugs he possessed. Indeed, it is inconceivable that a State could rationally choose to penalize one

who possesses large quantities of alcohol in a manner similar to that in which Michigan has chosen to punish petitioner for cocaine possession, because of the tangential effects which might ultimately be traced to the alcohol at issue. "Unfortunately, grave evils such as the narcotics traffic can too easily cause threats to our basic liberties by making attractive the adoption of constitutionally forbidden shortcuts that might suppress and blot out more quickly the unpopular and dangerous conduct." *Turner* v. *United States*, 396 U. S. 398, 427 (1970) (Black, J., dissenting). That is precisely the course JUSTICE KENNEDY advocates here.

The "absolute magnitude" of petitioner's crime is not exceptionally serious. Because possession is necessarily a lesser included offense of possession with intent to distribute, it is odd to punish the former as severely as the latter. Cf. *Solem, supra*, at 293. Nor is the requisite intent for the crime sufficient to render it particularly grave. To convict someone under the possession statute, it is only necessary to prove that the defendant knowingly possessed a mixture containing narcotics which weighs at least 650 grams. There is no *mens rea* requirement of intent to distribute the drugs, as there is in the parallel statute. Indeed, the presence of a separate statute which reaches manufacture, delivery, or possession with intent to do either undermines the State's position that the purpose of the *possession* statute was to reach drug dealers.[5] Although "[i]ntent to deliver can be inferred from the amount of a controlled substance possessed by the

---

[5] The Court of Appeals for the Sixth Circuit has applied the *Solem* factors to uphold the mandatory life sentence imposed by the Michigan statute concerning possession with intent to deliver 650 or more grams of narcotics. See *Young* v. *Miller*, 883 F. 2d 1276 (1989), cert. pending, No. 89–6960. In so doing, the court recognized that the sentence was particularly harsh, especially in light of the lack of opportunity for the exercise of judicial discretion, but found that it was not so disproportionate to other sentences for drug *trafficking* as to violate the Eighth Amendment. *Id.*, at 1284–1285. Because the statute at issue here concerns only drug *possession*, the Sixth Circuit's analysis has little relevance.

accused," *People* v. *Abrego*, 72 Mich. App. 176, 181, 249 N. W. 2d 345, 347 (1976), the inference is one to be drawn by the jury, see *People* v. *Kirchoff*, 74 Mich. App. 641, 647–649, 254 N. W. 2d 793, 796–797 (1977). In addition, while there is usually a pecuniary motive when someone possesses a drug with intent to deliver it, such a motive need not exist in the case of mere possession. Cf. *Solem*, 463 U. S., at 293–294. Finally, this statute applies equally to first-time offenders, such as petitioner, and recidivists. Consequently, the particular concerns reflected in recidivist statutes such as those in *Rummel* and *Solem* are not at issue here.

There is an additional concern present here. The State has conceded that it chose not to prosecute Harmelin under the statute prohibiting possession with intent to deliver, because it was "not necessary and not prudent to make it more difficult for us to win a prosecution." Tr. of Oral Arg. 30–31. The State thus aimed to avoid having to establish Harmelin's intent to distribute by prosecuting him instead under the possession statute.[6] Because the statutory punishment for the two crimes is the same, the State succeeded in punishing Harmelin as if he had been convicted of the more serious crime without being put to the test of proving his guilt on those charges.

The second prong of the *Solem* analysis is an examination of "the sentences imposed on other criminals in the same jurisdiction." 463 U. S., at 292. As noted above, there is no death penalty in Michigan; consequently, life without parole,

---

[6] Both the State and JUSTICE KENNEDY, see *ante*, at 1008, point to the fact that the amount and purity of the drugs and Harmelin's possession of a beeper, coded phone book, and gun all were noted in the presentence report and provided circumstantial evidence of an intent to distribute. None of this information, however, was relevant to a prosecution under the possession statute. Indeed, because the sentence is statutorily mandated for mere possession, there was no reason for defense counsel to challenge the presence of this information in the presentence report. See Tr. of Oral Arg. 10. It would likewise be inappropriate to consider petitioner's characteristics in assessing the constitutionality of the penalty.

the punishment mandated here, is the harshest penalty available. It is reserved for three crimes: first-degree murder, see Mich. Comp. Laws Ann. § 750.316 (West 1991); manufacture, distribution, or possession with intent to manufacture or distribute 650 grams or more of narcotics; and possession of 650 grams or more of narcotics. Crimes directed against the persons and property of others—such as second-degree murder, § 750.317; rape, § 750.520b; and armed robbery, § 750.529—do not carry such a harsh mandatory sentence, although they do provide for the possibility of a life sentence in the exercise of judicial discretion. It is clear that petitioner "has been treated in the same manner as, or more severely than, criminals who have committed far more serious crimes." 463 U. S., at 299.

The third factor set forth in *Solem* examines "the sentences imposed for commission of the same crime in other jurisdictions." *Id.*, at 291–292. No other jurisdiction imposes a punishment nearly as severe as Michigan's for possession of the amount of drugs at issue here. Of the remaining 49 States, only Alabama provides for a mandatory sentence of life imprisonment without possibility of parole for a first-time drug offender, and then only when a defendant possesses *10 kilograms* or more of cocaine. Ala. Code § 13A–12–231(2)(d) (Supp. 1990). Possession of the amount of cocaine at issue here would subject an Alabama defendant to a mandatory minimum sentence of only five years in prison. § 13A–12–231(2)(b).[7] Even under the Federal Sentencing Guidelines, with all relevant enhancements, petitioner's sentence would barely exceed 10 years. See United States Sentencing Com-

---

[7] The Alabama statute is entitled "Trafficking in cannabis, cocaine, etc.," and punishes "[a]ny person who knowingly sells, manufactures, delivers, or brings into this state, or who is knowingly in actual or constructive possession of" specified amounts of various drugs. See Ala. Code § 13A–12–231(1) (Supp. 1990). The mandatory minimum sentences vary depending on the particular drug involved and the amount of the drug at issue.

mission Guidelines Manual § 2D1.1 (1990). Thus, "[i]t appears that [petitioner] was treated more severely than he. would have been in any other State." *Solem, supra,* at 300. Indeed, the fact that no other jurisdiction provides such a severe, mandatory penalty for possession of this quantity of drugs is enough to establish "the degree of national consensus this Court has previously thought sufficient to label a particular punishment cruel and unusual." *Stanford,* 492 U. S., at 371. Cf. *Coker,* 433 U. S., at 596; *Ford* v. *Wainwright,* 477 U. S. 399, 408 (1986).

Application of *Solem's* proportionality analysis leaves no doubt that the Michigan statute at issue fails constitutional muster.[8] The statutorily mandated penalty of life without possibility of parole for possession of narcotics is unconstitutionally disproportionate in that it violates the Eighth Amendment's prohibition against cruel and unusual punishment. Consequently, I would reverse the decision of the Michigan Court of Appeals.

JUSTICE MARSHALL, dissenting.

I agree with JUSTICE WHITE's dissenting opinion, except insofar as it asserts that the Eighth Amendment's Cruel and Unusual Punishments Clause does not proscribe the death penalty. I adhere to my view that capital punishment is in all instances unconstitutional. See *Gregg* v. *Georgia,* 428 U. S. 153, 231 (1976) (MARSHALL, J., dissenting). I also believe that, "[b]ecause of the uniqueness of the death penalty," *id.,* at 188 (opinion of Stewart, Powell, and STEVENS, JJ.), the Eighth Amendment requires comparative proportionality review of capital sentences. See *Turner* v. *California,* 498 U. S. 1053, 1054 (1991) (MARSHALL, J., dissenting from denial of certiorari). However, my view that capital punish-

---

[8] Because the statute under which petitioner was convicted is unconstitutional under *Solem,* there is no need to reach his remaining argument that imposition of a life sentence without the possibility of parole necessitates the sort of individualized sentencing determination heretofore reserved for defendants subject to the death penalty.

ment is especially proscribed and, where not proscribed, especially restricted by the Eighth Amendment is not inconsistent with JUSTICE WHITE's central conclusion, *ante*, at 1012–1015, that the Eighth Amendment also imposes a general proportionality requirement. As JUSTICE WHITE notes, this Court has recognized and applied that requirement in both capital and noncapital cases, and had it done so properly here it would have concluded that Michigan's law mandating life sentences with no possibility of parole even for first-time drug possession offenders is unconstitutional.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

While I agree wholeheartedly with JUSTICE WHITE's dissenting opinion, I believe an additional comment is appropriate.

The severity of the sentence that Michigan has mandated for the crime of possession of more than 650 grams of cocaine, whether diluted or undiluted, does not place the sentence in the same category as capital punishment. I remain convinced that Justice Stewart correctly characterized the penalty of death as "unique" because of "its absolute renunciation of all that is embodied in our concept of humanity." *Furman* v. *Georgia*, 408 U. S. 238, 306 (1972) (Stewart, J., concurring). Nevertheless, a mandatory sentence of life imprisonment without the possibility of parole does share one important characteristic of a death sentence: The offender will never regain his freedom. Because such a sentence does not even purport to serve a rehabilitative function, the sentence must rest on a rational determination that the punished "criminal conduct is so atrocious that society's interest in deterrence and retribution wholly outweighs any considerations of reform or rehabilitation of the perpetrator." *Id.*, at 307. Serious as this defendant's crime was, I believe it is irrational to conclude that every similar offender is wholly incorrigible.

The death sentences that were at issue and invalidated in *Furman* were "cruel and unusual in the same way that being

struck by lightning is cruel and unusual." *Id.*, at 309. In my opinion the imposition of a life sentence without possibility of parole on this petitioner is equally capricious. As JUSTICE WHITE has pointed out, under the Federal Sentencing Guidelines, with all relevant enhancements, petitioner's sentence would barely exceed 10 years. *Ante*, at 1026–1027. In most States, the period of incarceration for a first offender like petitioner would be substantially shorter. No jurisdiction except Michigan has concluded that the offense belongs in a category where reform and rehabilitation are considered totally unattainable. Accordingly, the notion that this sentence satisfies any meaningful requirement of proportionality is itself both cruel and unusual.

I respectfully dissent.