**Opinion filed May 12, 2022**



In The

# Eleventh Court of Appeals

_____

## No. 11-20-00174-CR

_____

**ELI ANTON ROBLES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 42nd District Court**

**Taylor County, Texas**

**Trial Court Cause No. 28312A**

## M E M O R A N D U M   O P I N I O N

Appellant, Eli Anton Robles, was indicted for the first-degree felony offense of aggravated assault with a deadly weapon. TEX. PENAL CODE ANN. § 22.02(a), (b)(3) (West Supp. 2021). He entered an open plea of guilty, waived his right to a jury trial, and requested that the trial court assess his punishment. After a punishment hearing, the trial court assessed Appellant's punishment at twenty years'

imprisonment in the Texas Department of Criminal Justice, Institutional Division, and sentenced him accordingly. Appellant presents a single issue on appeal: that the imposed sentence violates his constitutional right against cruel and unusual punishment. We affirm.

## I. *Factual Background*

Appellant was charged with, and later indicted for, aggravated assault with a deadly weapon when, while in a motor vehicle, he (1) knowingly discharged a firearm at or in the direction of another motor vehicle, (2) acted recklessly in determining whether the vehicle fired upon was occupied, and (3) caused serious bodily injury by his actions; the indicted offense is a first-degree felony. *Id.* § 22.02(b)(3). After Appellant entered his guilty plea, the trial court ordered that a presentence investigation report be prepared before the punishment hearing. At the punishment hearing, the State called four witnesses: Thomas Joel Peavy III, John Graham, Jack Needham, and Andrew Kestler. Appellant testified as did his mother, Vanessa Cardona.

### A. *Officer Thomas Joel Peavy, III*

Thomas Peavy is an officer with the Abilene Police Department. On the day of the offense, while off-duty, Officer Peavy was leaving his residence at around 8:30 p.m. when he heard the discharge of five or six gunshots. He stated that this was not unusual because he lived in a rural area outside of Abilene—the Callahan Divide residential area. He proceeded to drive away from his residence until he reached the turnoff to the highway. There, he saw a red pickup in the grass beside the roadway. He also saw a Taylor County deputy sheriff on the scene walking toward the pickup. Officer Peavy then noticed that the passenger-side door of the pickup was open, and an individual—Andrew Kestler—was lying in the grass.

2

Officer Peavy and the deputy sheriff approached Kestler, and Officer Peavy immediately observed that Kestler had sustained multiple gunshot wounds, including an entry wound to the bottom of his chin; blood was also secreting from Kestler's chest. Officer Peavy heard the deputy sheriff ask Kestler what had happened. Kestler responded that a dark vehicle had pulled up beside him and shot at him. After Officer Peavy and other law enforcement officers secured the scene and provided medical assistance to Kestler (he was eventually transported to a hospital by ambulance), Officer Peavy noticed that the driver-side door of the pickup was riddled with six bullet holes—three in the door and three in the window.

B. *Detective John Graham*

At the time of the sentencing hearing, Detective Graham had been a deputy sheriff with the Taylor County Sheriff's Office for twenty-four years. When he arrived at the scene, Detective Graham observed a pickup parked in the grass next to the roadway. He observed six bullet holes in the driver-side door of the pickup— three in the door and three through the glass. He testified that he had investigated "countless" shootings in his career and that, in his experience, these bullet holes were "very well placed" to target the driver of the pickup. He looked inside the pickup and saw a "considerable amount" of blood smeared throughout its interior.

Detective Graham further testified that the follow-up investigation revealed that the victim, Kestler, had agreed to meet four young individuals—one of whom was Appellant—in the HEB parking lot to sell them marihuana and that they intended to give Kestler a counterfeit one-hundred-dollar bill in exchange for the drugs. The drug deal fell through and Kestler drove away from the parking lot. The four young individuals got in their vehicle and followed Kestler for approximately

3

fifteen miles along the highway. As they followed, one member of the group texted Kestler several times.

The day after the shooting, and after he had been identified as a suspect, Appellant voluntarily went to the Taylor County Sheriff's Office for an interview with Detective Graham. Detective Graham testified that, during the interview, Appellant, who was seventeen at the time, appeared ill; he was also sweating profusely. According to Detective Graham, Appellant was polite and never hostile, but he was not very forthcoming. Eventually, Appellant admitted that he had a pistol and fired shots into Kestler's vehicle. Appellant claimed that he had found the pistol in an alley. Appellant was seated in the back passenger-side seat of the vehicle when the shots were fired. He told Detective Graham that he may have been fearful of the circumstances and that Kestler swerved his pickup at their vehicle—a suburban-type SUV—while they pursued him.

Detective Graham testified that the bullet holes in the driver-side door of Kestler's vehicle indicated that the two vehicles would have had to be driving side by side when the shots were fired by Appellant. He further testified that Appellant did not claim that Kestler had a weapon. Appellant told Detective Graham that he was trying to scare Kestler by shooting into his vehicle. Detective Graham stated that, based on his observation of the "well placed" bullet holes in Kestler's vehicle, he did not interpret Appellant's intent to be to only scare the driver. Appellant threw the pistol out the vehicle's window after shooting into Kestler's vehicle. Despite their best efforts, law enforcement was unable to recover the weapon. At the end of the interview, after Appellant admitted to his participation in the shooting, Detective Graham observed that Appellant no longer appeared ill, although he was teary-eyed.

On cross-examination, Detective Graham agreed that Appellant appeared to be soft spoken and did not appear to be a "stone-cold killer." Detective Graham also agreed that his investigation did not reveal that Appellant had any criminal history. He agreed it was possible that Appellant was intoxicated from marihuana use at the time of the incident, although at no time during the interview did Appellant appear impaired. However, when asked if Appellant's actions could be considered to be, in part, due to stupidity because of his young age, Detective Graham disagreed; he stated that "pulling out a gun and shooting it six times into a vehicle that you've chased [fifteen] miles is beyond stupid."

In addition to Appellant, Detective Graham interviewed two of the other individuals who were involved in the shooting of Kestler. Each of them confessed to some level of involvement in the incident.

C. *Doctor Jack Needham*

Dr. Needham is a general surgeon at Hendrick Medical Center in Abilene. He has been licensed to practice medicine in Texas since 2011, is board certified by the American Board of Surgery, and has specialized training in minimally invasive surgery. Dr. Needham testified that because Hendrick Medical Center is the referral center for the surrounding twelve counties, he frequently sees gunshot and stabbing wounds. Dr. Needham examined and treated Kestler after he was shot. Dr. Needham noted that Kestler had four gunshot wounds: (1) one bullet entered and exited through his left hand; (2) one bullet lodged in his left elbow and caused a bone fracture; (3) one bullet entered through his chin, exited through his lip inside of his mouth, and lodged into the back of his left eye; and (4) one bullet entered his chest, just above the left nipple, and lodged in his right lung.

Dr. Needham explained that the gunshot wound to Kestler's chest was life-threatening because it traveled across his chest, past major vessels. According to Dr. Needham, a fatality can rapidly result from that type of circumstance. He recounted that he performed two bedside procedures—inserting a chest tube on both sides of Kestler's chest to drain blood that had accumulated and re-expand his lungs. Other doctors performed surgeries to remove the bullet from Kestler's elbow and to remove a bullet fragment from behind his left eye, as well as to repair a puncture in Kestler's left eye that was caused by the bullet fragment.

Dr. Needham stated that he was familiar with the legal definition of "serious bodily injury." In his medical opinion, the injuries that Kestler sustained constituted serious bodily injury.

D. *Andrew Kestler*

Kestler was seventeen at the time he was shot. He now attends Texas Tech University. On the day of the shooting, Kestler agreed to sell marihuana to an acquaintance. He testified that he had slightly over twenty-eight grams of marihuana in his possession that day. They agreed to meet at around 8:00 p.m. in the HEB parking lot. The buyers, including Appellant, were in a gray SUV. Kestler only knew one of the four people in the SUV; he did not know Appellant. Kestler asked one of the buyers to get into his pickup to consummate the transaction. However, they insisted on making the drug purchase through the windows of the vehicles. One of the buyers showed Kestler a folded-up one-hundred-dollar bill. When he instructed them to unfold it, he saw that it appeared to be ripped and cut. At this, Kestler terminated the deal and drove away from the HEB parking lot.

After Kestler got on the highway, he and one of the buyers began exchanging text messages and "things got heated." Kestler testified that, as he was driving near

6

the Callahan Divide residential area, he had the music playing loudly in his pickup and he suddenly realized that he was bleeding from his chin. He looked over and saw that the glass of his vehicle's left window had been shattered. Kestler then saw another vehicle driving next to him on his left. Kestler realized that someone in the vehicle was shooting at him. Upon realizing he had been shot, Kestler braked and pulled to the side of the highway. He opened the passenger-side door to his pickup, threw out the marihuana, and called 9-1-1. He could not tell how many times he had been shot, but he knew his chest wound was serious. Kestler noticed that the vehicle that had been driving alongside him crossed over to the opposite side of the highway and headed back toward Abilene.

Kestler testified that the injuries he sustained have resulted in several permanent impairments. His left pupil is deformed and he suffers from long-term visual impairments, including the development of a cataract and hazy vision in his left eye. The bullet that lodged in his right lung was never removed and may remain there permanently. His left elbow is also permanently impaired. Kestler was hospitalized for four days and underwent seven surgical procedures as a result of the damage caused by the bullets. Kestler also testified that he suffers from symptoms of posttraumatic stress disorder and depression, for which he attended some counseling.

E. *Vanessa Cordona*

Cordona is Appellant's mother. She testified that, in addition to his lack of a criminal history, Appellant also was never in trouble at school; nor was he a bully, except for on one occasion when he was suspended for fighting. Appellant has three brothers, and Cordona testified that they all got along. She stated that Appellant is dyslexic and attended special education classes. But she agreed that Appellant was

7

aware of his actions and knew what he had done. According to Cordona, Appellant has been withdrawn and has "stayed to himself" since the shooting. He "doesn't do much" and "stays at home." She testified that Appellant was the type of person that would help you if you needed it. She also stated that Appellant's two younger brothers had learned from this experience to think before they act.

Cordona agreed that Appellant should be punished for his conduct. She stated that she did not know why Appellant had shot Kestler and that it was out of character for him to have done such a thing. She asked the trial court to grant Appellant probation because what he did was a mistake, and she would like for his nieces and nephews to be able to grow up with him.

F. *Appellant, Eli Robles*

When asked if he thought shooting Kestler was an evil act, Appellant responded: "I guess, but I see it as a mistake. . . . I'm sorry. I really am." He apologized to Kestler and his family. Appellant testified that he did not know what he hoped to accomplish when he and the others followed Kestler on the highway that day. He stated that he did not intend to shoot Kestler until "everything led up." According to Appellant, he was not involved in any discussions that resulted in the texting with Kestler. He stated that he thought the proper punishment for his conduct should be five to ten years in prison. He also understood that being seventeen did not excuse his actions.

Appellant admitted that he had smoked two blunts on the day of the shooting. As for the pistol, he claimed to have found it in an alley two or three weeks beforehand. He stated that the others asked him to bring the pistol to the drug deal and that he had placed it on the floorboard when they pulled into the HEB parking lot to meet with Kestler. Appellant stated that when, as they chased Kestler, the

vehicle he was in pulled up next to Kestler's pickup, he pointed the pistol at Kestler's vehicle and fired it six times. Appellant said he did not know why he did it and that it was a "moment of weakness." He admitted that he was aiming at Kestler when he fired the pistol, but he claimed he was not trying to kill Kestler.

## II. *Analysis*

As a threshold matter, the State contends that Appellant has waived his objection to the alleged unconstitutional disproportionality of his sentence because he failed to object or complain about this issue in the trial court. We agree.

To preserve error for appellate review, a party must make a timely objection to the trial court, state the specific grounds for the objection, and obtain a ruling. TEX. R. APP. P. 33.1(a). Therefore, to preserve a complaint that an imposed sentence constitutes cruel and unusual punishment, as Appellant asserts, a defendant must first raise the issue in the trial court. *See Burt v. State*, 396 S.W.3d 574, 577 (Tex. Crim. App. 2013). Here, Appellant did not assert any objection in the trial court, either at the time his sentence was imposed or in any posttrial motion. Further, Appellant did not object on constitutional or other grounds, including the grounds that he now asserts on appeal, that the sentence imposed by the trial court was cruel, unusual, excessive, or disproportionate to sentences that other individuals had received for the same offense. Therefore, he failed to preserve error for our review and has waived his complaint on appeal. *See Vidaurri v. State*, 49 S.W.3d 880, 886 (Tex. Crim. App. 2001); *Rhoades v. State*, 934 S.W.2d 113, 119 (Tex. Crim. App. 1996) (the failure to raise Eighth Amendment issues in the trial court or in a motion for new trial will not preserve error for appeal); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995) (holding that Eighth Amendment issues are subject to the

error preservation rule and are forfeited if not raised in the trial court); *Alvarez v. State*, 525 S.W.3d 890, 892 (Tex. App.—Eastland 2017, pet. ref'd).

Notwithstanding Appellant's waiver of his complaint, we conclude that the sentence imposed upon him by the trial court does not constitute cruel or unusual punishment. When we review a trial court's sentencing determination, we note that trial courts are afforded "a great deal of discretion" in sentencing decisions. *Renfroe v. State*, 529 S.W.3d 229, 233 (Tex. App.—Eastland 2017, pet. ref'd) (quoting *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984)). Therefore, we will not disturb a trial court's decision as to punishment absent a showing of an abuse of discretion and harm. *Id.* (citing *Jackson*, 680 S.W.2d at 814).

Although Appellant specifically challenges the sentence imposed by the trial court under the Eight Amendment to the United States Constitution, both the United States Constitution and the Texas Constitution include protections against cruel and unusual punishment. *See* U.S. CONST. amend. VIII; TEX. CONST. art. 1, § 13. The Texas Court of Criminal Appeals has held that there is no significant difference between these constitutional protections. *See Cantu v. State*, 939 S.W.2d 627, 645 (Tex. Crim. App. 1997).

Punishment is generally not considered to be cruel and unusual if the imposed sentence falls within the charged offense's statutory range of punishment. *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016); *Sneed v. State*, 406 S.W.3d 638, 643 (Tex. App.—Eastland 2013, no pet.). However, a narrow exception to this rule exists: when the imposed sentence is grossly disproportionate to the charged offense, it may constitute cruel and unusual punishment, even if it is within the offense's statutory range of punishment. *Renfroe*, 529 S.W.3d at 233 (citing *Solem v. Helm*, 463 U.S. 277, 290–92 (1983)); *Sneed*, 406 S.W.3d at 643. Nevertheless,

"[o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare." *Solem*, 463 U.S. at 289–90 (alterations in original) (quoting *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)).

To evaluate the proportionality of a sentence, the first step is to make a threshold comparison between the gravity of the charged offense and the severity of the sentence imposed. *Simpson*, 488 S.W.3d at 322; *Renfroe*, 529 S.W.3d at 234; *see Harmelin v. Michgan*, 501 U.S. 957, 1005 (1991) (Kennedy, J., concurring). When we analyze the gravity of the charged offense, we review the harm caused or threatened to the victim and the culpability of the offender. *Renfroe*, 529 S.W.3d at 234. However, if we do not find a gross disproportionality, our analysis ends there. *See Harmelin*, 501 U.S. at 1005; *Renfroe*, 529 S.W.3d at 234 (citing *Bradfield v. State*, 42 S.W.3d 350, 353–54 (Tex. App.—Eastland 2001, pet. ref'd)).

The punishment range for a first-degree felony offense, such as the offense committed by Appellant, is either imprisonment for life or for a term of not less than five years but no more than ninety-nine years. PENAL § 12.32(a) (West 2019). In this case, the trial court assessed Appellant's punishment at twenty years' imprisonment. After a "blown up" drug deal, Appellant and others pursued Kestler for fifteen miles until Appellant fired six bullets at Kestler, which has caused him to suffer multiple debilitating injuries, including a life-threatening chest wound. Although Appellant was a young man at the time of this offense, even he testified that a prison sentence was the appropriate punishment for his attack on Kestler. By all accounts, Appellant committed a serious offense—the gravity of his conduct was significant and its effect on Kestler is irreparable.

We have thoroughly reviewed the record before us. Considering the gravity of the offense committed by Appellant and the sentence that the trial court imposed in this instance, which is clearly on the lower end of the applicable punishment range for such an offense, we cannot say that Appellant's sentence was grossly disproportionate to the offense for which he was charged. Therefore, we hold that the trial court did not abuse its discretion, nor did it violate Appellant's Eight Amendment rights, when it assessed Appellant's punishment for this offense at twenty years' imprisonment. *See Young v. State*, No. 11-16-00325-CR, 2018 WL 5290020, at *3 (Tex. App.—Eastland Oct. 25, 2018, no pet.) (the defendant's sentence of twenty years' imprisonment for the offense of aggravated assault was not violative of the Eighth Amendment even though the defendant entered an open plea of guilty and had no prior criminal history). Accordingly, we overrule Appellant's sole issue.

### III. *This Court's Ruling*

We affirm the judgment of the trial court.

W. STACY TROTTER
JUSTICE

May 12, 2022

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.